Och *et al.* v. The Missouri, Kansas & Texas Railway Company, *Appellant.*

In Banc, July 2, 1895.

1. **Equity:** RELEASE: RAILROAD: NEGLIGENCE. Plaintiff was a passenger on defendant's train, and was injured by a ventilating window of the car falling on her head, rendering her unconscious, as testified to by her. Shortly after the accident, and before she had reached her destination, defendant's claim agent offered her $20 and tendered a release in full for her execution. Plaintiff testified that she objected to signing the paper, because she noticed something in it about a release for all damages; that the agent then, in her presence, made an erasure, giving her to understand that he limited the scope of the instrument to a release of damages suffered prior to its execution; that, relying on the agent's conduct and assurance, and being in a bewildered condition of mind, she signed the paper without reading it again. The paper signed was an absolute release for all damages. *Held,* that, until set aside in an equitable proceeding for fraud in its procurement, it was a bar to an action for injuries caused by the accident.

2. ———: ———: ———: ———. The consideration for the release must be returned or tendered, as a condition precedent to such cancellation.

3. **Contract, Void and Voidable.** A void contract may be disregarded by either party, but it is otherwise as to a contract merely voidable.

130   27
123   614
66a   337

130   27
138   549
139   454
71a   432

130   27
149   152
150   281
79a   60
79a   632

130   27
154   432

130   27
85a   36

130   27
160   636

130   27
e91a  350

130        27
93a   586
93a   ¹590

130        27
95a   ¹472
96a   ⁶483
96a   ¹615
98a   ⁴187
98a   ⁴405

130        27
102a  ⁶541

4. ———. An executed contract between competent parties, founded on a valuable consideration, not immoral or prohibited by statute, nor against public policy, is not void as between the parties thereto, however fraudulently obtained.

5. Railroad: PASSENGER: NEGLIGENCE: RELEASE. A passenger injured on a railway train, who releases the company by an agreement expressly restricted to the injuries then perceptible, may recover for injuries subsequently appearing.

6. ———: ———: ,———: BURDEN OF PROOF. Where a passenger on a railway train is injured by the fall of a ventilating window of the coach in which she is riding, the burden is on defendant to disprove negligence.

7. ———: ———: RELEASE: INSUFFICIENT MENTAL CAPACITY. Where, in an action for damages to which a release is pleaded as a defense, there is no evidence of want of sufficient mental capacity to execute the release, that question should not be submitted to the jury.

8. ———: ———: ———: DAMAGES: INSTRUCTION. An instruction which permits one injured on a train, who accepted payment for the injuries perceptible at the time, to recover for all the injuries, including those embraced in the settlement, is erroneous.

*Appeal from St. Louis City Circuit Court.*—HON. JOHN A. HARRISON, Judge.

REVERSED AND REMANDED.

*Jackson & Montgomery* for appellant.

(1) The release pleaded in the answer was a bar to the cause of action stated in the petition until rescinded in some legal method, and it was error to try the issue of fraud, as raised in the reply, jointly with the other issues in the case, before a jury. The issue of the fraud or good faith of the release should have been tried separately as a proceeding in equity. Anson on Contracts, p. 163; Lawson on Contracts, sec. 248; Bishop on Contracts, sec. 611; *Jarrett v. Morton,* 44 Mo. 275; *Estes v. Reynolds,* 75 Mo. 565; *Hart v. Handlin,* 43 Mo. 171; *Melton v. Smith,* 65 Mo. 315; *Cohn v. Reid,* 18 Mo. App. 115; *Schultz v. Christman,* 6 Mo.

App. 338; *Taylor v. Short*, 107 Mo. 384; *Pearsal v. Chapin*, 44 Pa. St. 9; *Kinne v. Webb*, 49 Fed. Rep. 512; *Railroad v. Hayes*, 10 S. E. Rep. 350; *Home Ins. Co. v. Howard*, 111 Ind. 544; *Cobb v. Hatfield*, 46 N. Y. 533; *Graham v. Meyer*, 99 N. Y. 611; *Kimball v. Cunningham*, 4 Mass. 502; *Thayer v. Turner*, 8 Metc. 550; *Moriarty v. Stofferan*, 89 Ill. 528; *Doane v. Lockwood*, 115 Ill. 490; *Pieree v. Wood*, 3 Foster (N. H.) 519; *Tisdale v. Buckmore*, 33 Me. 461; *Kreuzner v. Street R'y Co.*, 13 N. Y. Sup. 588; *McMichael v. Kilmer*, 76 N. Y. 36; *Grymes v. Sanders*, 93 U. S. 62; *McLean v. Clapp*, 141 U. S. 429. The plaintiff could not retain the benefits of the settlement and at the same time assail its good faith. Cases cited above. (2) Even if it had been proper to try the issue of the fraudulent character of the release in that manner, the court erred in allowing the case to go to the jury, because the evidence did not sustain the allegations of the reply, and did not make out a case of fraud on any theory. *Mateer v. Railroad*, 105 Mo. 320. (3) The plaintiff's instructions generally, and especially the sixth one, were erroneous, because they authorized a splitting of plaintiff's cause of action into separate parts. *Nemo debet bis vexari pro una et eadem causa.* *Mateer v. Railroad, supra; Funk v. Funk*, 35 Mo. App. 246; *Moran v. Plankinton*, 64 Mo. 337; *Green v. Von der Ahe*, 36 Mo. App. 394; *Union R. R. & T. Co. v. Traube*, 59 Mo. 355. (4) The liability of the defendant depended upon its negligence in observing the degree of care resting upon it, with regard to the matters complained of. That degree of care must be commensurate with the nature and use of the ventilator, and the possibility of dangerous consequences from its use. 2 Wood's R'y Law, secs. 301 and 302 and notes; *Sawyer v. Railroad*, 37 Mo. 240; *Dougherty v. Railroad*, 97 Mo. 447; *Smith v. Railroad*, 108 Mo. 243; *Hegeman v. Railroad*, 13 N.

Y. 9. (5) The defendant !discharged its duty as to the degree of care required of it in relation to the character and condition of the ventilator, when it made the various inspections mentioned in the evidence. 2 Wood's R'y Law, sec. 300; *McPadden v. Railroad*, 44 N. Y. 478; *Robinson v. Railroad*, 9 Fed. Rep. 877; *Hegeman v. Railroad*, 13 N. Y. 9. (6) Defendant was not liable for an accident resulting from the act of a third person, of which its agents did not know and did not have time to know prior to the accident. Therefore defendant's fifth instruction should have been given. There was no negligence where there was no reason to anticipate injury. *Deyo v. Railroad*, 34 N. Y. 9; *Frink v. Potter*, 17 Ill. 406; *Farnish v. Reigle*, 11 Gratt. 697; *Stockton v. Fray*, 4 Gill, 406; *McClenahan v. Brock*, 5 Rich, 17; Hutchinson on Carriers, sec. 521; Ray's Neg. of Imp. Duties, sec. 15, pp. 135–141; *Putnam v. Railroad*, 55 N. Y. 108; *Railroad v. Hinds*, 53 Pa. St. 512. (7) Plaintiff's second instruction was erroneous, because it raised the same presumption in favor of plaintiff and cast the same burden of proof on defendant in regard to the conduct of the porter that it did in regard to the condition of the car. There was no proof of any negligence by the porter. *Hawkins v. Cable R'y Co.*, 28 Pac. Rep. 1021; *Railroad v. Gibson*, 96 Pa. St. 83; *Fearn v. Ferry Co:*, 22 Atl. Rep. 708; *Hayman v. Railroad*, 11 Atl. Rep. 815; *Herstine v. Railroad*, 25 Atl. Rep. 104; *Sawyer v. Railroad*, 37 Mo. 240; *Curtis v. Railroad*, 18 N. Y. 534. (8) Plaintiff's sixth instruction was erroneous.

*Lee & Ellis* and *J. H. Zumbalen* for respondents.

(1) If rescission was necessary, the release could be rescinded in an action at law, and the issue made by the answer and reply was triable by jury. *Girard v.*

*St. Louis Car Wheel Co.* (Mo.), 27 S. W. Rep. 648. *First.* This was the rule at common law. 3 Black Comm. *p. 431; *Thoroughgood's case*, 2 Coke's Reports, *9; *Bright v. Eynon*, 1 Burrows, 390; *Alner v. George*, 1 Campbell, 392; *Wild v. Williams*, 6 Mees. & W. 490; *Phillips v. Claggett*, 11 Mees. & W. 84; 1 Chitty's Pleading [7 Ed.], *613; *Hoitt v. Holcomb*, 23 N. H. 535; *Larrabee v. Sewell*, 66 Me. 376; *O'Donnell v. Clinton*, 145 Mass. 461; *Railway Co. v. Welch*, 52 Ill. 187; *Eastman v. Wright*, 6 Pick. 316; *Railway Co. v. Lewis*, 109 Ill. 120; *O'Neil v. Iron Co.*, 63 Mich. 690; *Snyder v. Findley*, 1 N. J. L. 48; 2 Pomeroy's Eq. Jur. [2 Ed.], sec. 872. *Second.* The rule is the same under the reformed procedure and pleading. Bliss, Code Pl. [2 Ed.], sec. 201; *Bussian v. Railroad*, 56 Wis. 325; *Schultz v. Railway Co.*, 44 Wis. 638; *Lusted v. Railway Co.*, 71 Wis. 391; *Dambman v. Schulting*, 4 Hun (N. Y.), 50; *Smith v. Salomon*, 7 Daly (N. Y.), 216; *Dixon v. Railway Co.*, 100 N. Y. 170; *Peterson v. Railroad*, 36 Minn. 399; s. c., 38 Minn. 511; *Railway Co. v. Doyle*, 18 Kan. 58; *Pipe & Steel Co. v. Copple* (Ky.), 22 S. W. Rep. 323; *Railway Co. v. Brazzill*, 78 Tex. 314. *Third.* Had the rule been otherwise at common law, the code of civil procedure would have changed the common law rule. R. S. 1889, secs. 2050, 2052, 2054; *Kitchen v. Railroad*, 59 Mo. 514; *Earl v. Hart*, 89 Mo. 263; *Wolff v. Schaeffer*, 74 Mo. 154; *Carter v. Prior*, 78 Mo. 222; *Bean v. Railroad*, 107 N. C. 731; *Canfield v. Tobias*, 21 Cal. 349; Bliss, Code Pleading [2 Ed.], sec. 200. *Fourth.* The Missouri decisions fully sustain the rule as above stated. *Wright v. McPike*, 70 Mo. 175; *Mateer v. Railroad*, 105 Mo. 320; *Williams v. Railroad*, 112 Mo. 463. *Fifth.* If a separate trial of the issues made by the answer and reply was necessary, the defendant waived his right to insist upon such separate trial. *Estes v. Fry*, 94 Mo.

266. (2) There was no occasion for rescission, because the alleged release was absolutely void and not merely voidable. Bishop on Contracts [Enlarged Ed.], secs. 611, 614; *Railway Co. v. Lewis*, 109 Ill. 120; Bispham's Equity [5 Ed.], sec. 202; Bishop on Contracts, 645, 646; *Aultman & Co. v. Olsen*, 34 Minn. 450; *Mullen v. Railroad*, 127 Mass. 86; *Foster v. Mackinnon*, L. R. 4 C. P. 704; *Friedly v. French*, 154 Mass. 339; *Sobieski v. Railroad*, 41 Minn. 169; *Smith v. Steamship Co.* (Cal.), 34 Pac. Rep. 84; *Butler v. Railroad*, 88 Ga. 598; *Briggs v. Ewart*, 51 Mo. 245; *Corby v. Weddle*, 57 Mo. 452; *Cole v. Wiedmair*, 19 Mo. App. 7; *Wright v. McPike*, 70 Mo. 175; *Tracy v. Iron Works*, 104 Mo. 193. (3) It was not necessary for the plaintiff to return or tender the money received on the alleged settlement, before bringing this suit. This question is not before the court for review. *Girard v. Car Wheel Co.* (Mo.), 27 S. W. Rep. 648; *Railroad v. Acuff* (Tenn.), 20 S. W. Rep. 348. *First.* Tender is unnecessary where contract is voidable for subsequently discovered fraud. *Duval v. Mowry*, 6 R. I. 479; *Hendrickson v. Hendrickson*, 51 Iowa, 68; *Smith v. Holyoke*, 112 Mass. 517; *Railroad v. Doyle*, 18 Kan. 58; *Railroad v. Brazzill*, 78 Tex. 314; *Railroad v. Lewis*, 109 Ill. 120; *O'Brien v. Railroad* (Iowa), 57 N. W. Rep. 425; *Schultz v. Railroad*, 44 Wis. 638; *O'Neil v. Iron Co.*, 63 Mich. 690; *Bean v. Railroad*, 107 N. C. 731. *Second.* Still less so, where, as here, the release is absolutely void. *Mullen v. Railroad*, 127 Mass. 86; *Sobieski v. Railroad*, 41 Minn. 169; *Aultman & Co. v. Olsen*, 34 Minn. 450; *Butler v. Railroad*, 88 Ga. 598; *Vautrain v. Railroad*, 8 Mo. App. 541; s. c., 78 Mo. 44; *Bliss v. Railroad*, 160 Mass. 447; *Pierce v. Wood*, 23 N. H. 534. (4) The rule that a party will not be permitted to split a single cause of action, does not apply. *First.* Because plaintiff has not recovered a prior judgment on this same

cause of action. *Bliss v. Railroad*, 160 Mass. 447. *Second.* Because the plaintiff was ignorant, at the time of the alleged settlement, of the extent of her injuries. *Moran v. Plankinton*, 64 Mo. 337; *Risley v. Squire*, 53 Barb. 280; *Bennett v. Hood*, 1 Allen, 47; *Mateer v. Railroad*, 105 Mo. 351. (5) *First.* If plaintiff's instruction as to the measure of damages was erroneous under the evidence, defendant can not complain because its instruction given contained the same fault. *Stevens v. Crane*, 116 Mo. 408; *Hazel v. Bank*, 95 Mo. 66. *Second.* But said instruction was not erroneous, because the evidence failed to disclose that a partial settlement had been made by the plaintiff.

BURGESS, J.—This is an action for damages for personal injuries sustained by the plaintiff Julia Och, while a passenger on one of defendant's trains *en route* from Gainesville, Texas, to St. Louis, Missouri. The plaintiff William Och is her husband. The suit was brought in the circuit court of the city of St. Louis. A trial before a jury resulted in a verdict and judgment for plaintiff in the sum of $7,521.45 from which defendant appealed.

The petition alleges "that on the seventh day of October, 1891, plaintiff Julia was a passenger on defendant's cars from Gainesville, Texas, to the city of Sedalia, Missouri, and while at a station called Greenridge before reaching and near to Sedalia, defendant's porter in charge of the car on which she was a passenger did negligently and carelessly pull out of its place a ventilating window in the roof of said car, which, through the negligence and carelessness of defendant, was insecurely affixed in its place, and was unsafe and defective in condition and construction, down onto the head and face of the plaintiff, cutting

and bruising her head and face and knocking her sense-less; that she remained unconscious for considerable time; that the falling of said ventilator onto the plain-tiff's head was without fault of the said plaintiff and was caused by the negligence of the said porter in forcibly and carelessly jerking the ventilator out of its fastenings, and also by the insecure and dangerous manner in which the same was then fastened in the roof of said car, as well as by the defective character and condition of the same at the time it fell, which insecure and dangerous manner and defective character and condition the defendant at and before the said date knew; or by the exercise of the care due toward its passengers, should and would have known."

The petition further alleges that, at the time of the injury, the plaintiff, Mrs. Och, was pregnant, and that, from the nervous shock caused by the blow on her head, she suffered a miscarriage; that she was for many days confined to her bed, and was finally com-pelled to submit to a painful and dangerous surgical operation in having one of her ovaries removed; that she is permanently disabled and crippled for life. The damages were laid at $25,000.

Defendant in its answer, admits that it is a cor-poration and a common carrier of passengers; and that on the seventh day of October, 1891, plaintiff Julia Och was a passenger upon one of its trains, but denies all other allegations in plaintiffs' petition. The answer then, as a special defense, alleges that after said acci-dent occurred, and on the same day plaintiff Julia claimed that she had been injured by a small ventila-tor falling upon her head, and that she had a demand against defendant on account of said injuries; that it fully compromised, adjusted and settled said claim and demand, and, for a valuable consideration paid by defendant to said Julia, she did then and there fully

release and discharge defendant from all claims of whatever kind or character that she might have on account of or arising from said alleged accident and injuries, and pleads said settlement and release in bar to plaintiffs' action."

To defendant's answer, plaintiffs made reply as follows:

"Now come the plaintiffs in the above entitled cause, and for their reply to the new matter set up in defendant's amended answer herein deny that on the seventh day of October, 1891, or at any other time, the plaintiff, Julia K. Och, compromised, adjusted or settled the claim and demand set out in her petition herein, and deny that she released and discharged the defendant from any and all claims of whatsoever kind and character that might arise out of the injuries of the plaintiff complained of in her petition.

"And further replying herein the plaintiffs aver that the employees and agents of defendant, including its physicians, surgeons, hospital nurses, claim agents and conductors, fraudulently conspired together to unfairly and unlawfully obtain from the plaintiff a written release of her cause of action in this suit; that in pursuance of such plan and conspiracy said agents within about an hour after she received the injuries complained of, and while she was in a feeble, bewildered and partially unconscious condition, took plaintiff to a railroad hospital in Sedalia, where the railroad surgeons and physicians at the instance of defendant, examined her injuries and pronounced them trifling and of no importance, and assuring plaintiff that she was not seriously injured and that she would suffer no inconvenience from her wounds; that thereupon the claim agent for the defendant company prepared a written receipt and release of her claim in the petition herein set out and tried to induce

plaintiff to sign it on payment to her of $20; that said plaintiff told said agent that she would not sign any release of her claim in this suit; that thereupon defendant's agent stated to her that he would change said writing so it should not be a release of any damages resulting from said injury, and he then and there professed and pretended to so change the same, and to strike out therefrom the release aforesaid, but, as plaintiffs have been informed, since the institution of this suit, and as they now aver, the said agent did not cancel or strike out or change said writing so as to exclude therefrom the release aforesaid; but at the time said agent assured plaintiff Julia K. Och that said change had been made; that, at the time, said plaintiff was sick in mind and body and was, from her mental condition, unable to carefully read and understand said writing, and, believing in, and relying upon, the representations so made by said agent, she did receive said money and signed said receipt and release so fraudulently and wrongfully obtained from her; that said plaintiff only signed said receipt on the faith of said representations, and except for that would have persisted in her refusal to sign the same; but that, relying upon said representations, she was fraudulently induced to execute the same.

"Wherefore plaintiffs say that her signature to said writing was fraudulently and wrongfully obtained, and therefore not lawfully executed by her. Wherefore plaintiffs ask the court to declare said instrument null and void, and for judgment as in the petition asked."

After the jury was impaneled, and before any evidence was introduced, defendant's counsel objected to the trial of the case by a jury on the ground that the pleadings present a question which should be tried by the court sitting as a court of equity before the

other branch of the case should be submitted to the jury. The objection was overruled and defendant duly excepted.

The material facts as disclosed by the evidence were as follows: The plaintiff was twenty-six years old, had been married eight years, and had a son seven years old, but had never had any other children. On October 6, 1891, she left Gainesville, Texas, for St. Louis, by way of the M., K. & T. railroad to Sedalia; thence by the Missouri Pacific to St. Louis. She rode in a chair car, and on the morning of October 7, when south of Greenridge, a station about twelve miles from Sedalia, the colored porter commenced to open the ventilators, which are placed in the elevation between the lower and upper decks of the car. He passed along opening them with a stick with a hook on the end of it, taking them in order, and when he touched the one over plaintiff, it fell and struck her on the head, breaking one of the small pieces of glass in it, and making an incision in her scalp about an inch or more back from the edge of her hair, and also bruising her lip. She testified that she was not conscious of the window falling on her head, and when she came to, there was a physician with her, and all the ladies around her; she saw glass and blood on the floor, and her head was being bathed, and the physician was picking glass out of her head.

When they got to Sedalia the physician took her out of the car and put her and her little boy in a carriage and took them to the railroad hospital; she was not acquainted with anyone in Sedalia. She testified that when she got to the hospital she was taken to a room where there were eight or ten doctors; they examined her head, bathed it and dressed it, applied some medicine, dressed the wound on her lip, gave her some arnica and told her to apply it, and assured her

that she was not seriously hurt, and that it did not amount to anything, that she was stunned and in a dazed condition and hardly knew what was going on; that she and her little boy were then taken to breakfast, but that she could not eat anything, that she was then taken to the room that she went from into the dining room, and there the doctors surrounded her and assured her that she was not seriously hurt and said they did not think that she would ever hear from it again.

With respect of the execution of the release by Mrs. Och, she testified, that she was introduced by the doctors to the claim agent of defendant, whose name is Hollister; that when introduced to him, he came forward and told her that he wanted to pay her for the inconvenience she had been put to, and little suffering, and asked her if she would accept $20 if she should need any medical attention on the way or after she got home; that he then handed her a receipt and said to her if she would sign it he would pay her $20; that she tried to read it over and saw something in there about a release, releasing the company always for all time; that she thought then she could hardly do it, that something might come up; she was stunned and dazed, yet she thought the blow on the head might produce other things; that she did not fully realize what was going on, and she told the claim agent, that she could not sign it under the circumstances; that he then took the papers and said he would fix that up to date; fix it so it would read only up to date; the payment up to date; that she did not know that he used the words but that is the way she understood it, that $20 was for payment up to date; if anything further should occur, to notify them, and they would be responsible; that he said that to her; that he had a pencil and made some erasures on the paper; that the paper does not

read as she thought it did; that her nervous condition was very much upset and bewildered, and she did not remember the paper as it is, signature and all; that the signature is somewhat in her handwriting.

Her attention was then called to the following language in the release, to wit: "I do hereby fully and forever release and discharge said company from any and all claims of whatever kind and character I may have on account of or arising from said accident or injuries in consideration of the sum of $20," and was asked if she remembered that language in the instrument which she saw and signed, to which she replied, "Something to that effect," and it was that that she objected to. She further stated that when she gave the paper to him and saw him make an erasure, she understood that he was erasing that part where it read that she did release the company; that she understood that he was erasing the words, "and I do hereby fully and forever release and discharge said company from any and all claims of whatever kind and character;" that he told her that he would scratch that out—"fix that," she thought, were the words he used, and watching him she supposed he had erased that part; that he had a pen or pencil with which to make the erasure, and that she saw him make an erasure or mark, and fully believed that he had made them; that he then handed her the paper to sign, and she signed it; that after she saw him make the erasure she did not read it again before she signed it; that he went right out after she signed the paper and took it with him; that she did not read the paper over again after he took it and made as she thought the erasure because she relied fully on his word. That he then paid her the $20; that she was feeling very poorly at the time, and had not recovered from the blow on the head; that she was stunned and did not

realize all, that is, all that was going on; that after she had signed the paper the doctors came in again and assured her that she was all right, and that she could proceed on her journey; that she was then taken to the train by one of the physicians, who put her aboard of the car; that she then met a gentleman who seemed to know all about the accident and an old lady, and that she asked plaintiff how she was feeling; that she was then feeling very much dazed; the pain was coming on.

On cross-examination she stated that, when she got to the hospital, the doctors washed and bathed her head and dressed the wound; that they applied some medicine and cotton, and she thought a bandage, but was not certain; that one wound was on top of her head, about in the center just back in the hair an inch or inch and a half, and the other was on her lip, just a gash across the lip, on the outside, not clear through; that the lady she met on the cars was Mrs. Beanland, and the gentleman a Mr. English, whose names and addresses she got before leaving Sedalia, and after having taken the Missouri Pacific train; that in doing this she acted upon the advice of Mr. English, who suggested she might be seriously ill; that she signed the paper relying upon the word of the claim agent that the part she objected to had been erased, and accepted the $20 which she had never returned.

The claim agent Hollister in his testimony denied all the material statements made by Mrs. Och.

There was further testimony tending to show that Mrs. Och was pregnant at the time of the injury, that she had a miscarriage in consequence thereof, suffered great pain, had to submit to a painful surgical operation in having one of her ovaries removed, and that her health is permanently impaired. The testimony of physicians introduced as witnesses on the part of defendant tended to show that the diseased ovary

might be attributable to other causes than that of pregnancy and miscarriage, and one of them testified that he thought she was not pregnant at the time of the injury, but was suffering from delayed menstruation.

Defendant's first contention is that the release pleaded in the answer is a bar to the cause of action stated in the petition until rescinded, and that it was error to try the issue of fraud as raised in the reply to defendant's answer jointly with the other issue in the case before a jury; that the issue of the fraud or good faith in obtaining the settlement and release should have been tried separately, as a proceeding in equity. Upon the other hand it is argued that if rescission was necessary, the release could be rescinded in an action at law, and the issue made by the answer and reply was triable by jury.

*Girard v. St. Louis Car Wheel Co.*, 123 Mo. 358, is relied upon by plaintiff as being in support of her contention. It is true that it was held in that case that a reply to a release, alleging that it was obtained by fraud, might be tried in an action at law, without resorting to equity to cancel such a document. The same rule has been announced by a number of courts of high standing. This may be conceded to be the law in case the party was wholly incompetent to contract or the execution of the release was obtained by fraud, that is, where the person executing it was induced to believe that he was signing one kind of an instrument when in fact he was executing an instrument of a different character. In that case plaintiff testified that he had no recollection of signing the release, and at the time was unable to read or comprehend anything.

In *Hartshorn v. Day*, 19 Howard, 223, it was said: "Fraud in the execution of the instrument has always

been admitted in a court of law, as where it has been misread, or some other fraud or imposition has been practiced upon the party in procuring his signature and seal.'' The case of *Wright v. McPike*, 70 Mo. 175, was of this character. Also, *Mullen v. Railroad*, 127 Mass. 86; *O'Donnell v. Clinton*, 145 Mass. 461; *Smith v. Holyoke*, 112 Mass. 517; *Rosenberg v. Doe*, 148 Mass. 560; *O'Neil v. Iron Company*, 63 Mich. 690; *Ryan v. Gross*, 68 Md. 377; *Kirchner v. Sewing Machine Co.*, 135 N. Y. 182. So, where no consideration has passed for the release, that defense may be made in an action at law. *Brewster v. Brewster*, 38 N. J. L. 119.

Or when a person sustains personal injuries and at the same time damages to his personal property, and his release and receipt of a moneyed consideration for injuries to his property and person are found, as to the latter, to have been obtained by fraud and without consideration, upon the belief that he was simply settling and receipting for injury to his property in an action for damages for the personal injuries, it is no obstacle to his recovery that he has not returned the money received by him in settlement for the damages to his property. *Bliss v. Railroad*, 160 Mass. 447; *Lusted v. Railroad*, 71 Wis. 391. In the latter class of cases the release does not go to the cause of action in suit.

Now, if Mrs. Och was induced by fraud, practiced upon her by the agent or servants of the defendant company, to execute the release, by which, she, in consideration of the sum of $20 then paid, released said company from all claims and demands against it for the personal injuries received by her, sued for in this action, when in truth and in fact she believed the release to be in full only if she should experience no further trouble from her injuries after that time—but if she did then the railroad company

would be responsible, and the injuries sued for developed after the execution of said release, the return of the money was not a prerequisite to her recovery in this action. In such case "the only evidence of fraud that can be received is that in relation to the execution of the instrument, as that the party was illiterate, and the deed was misread to him, or that another deed from that intended to be executed was substituted." *Burrows v. Alter*, 7 Mo. 424.

In *George v. Tate*, 102 U. S. 564, it was said: "Proof of fraudulent representations by Myers & Green, beyond the recitals in the bond, to induce its execution by the plaintiff in error, was properly rejected. It is well settled that the only fraud permissible to be proved at law in these cases *is fraud touching the execution of the instrument, such as misreading, the surreptitious substitution of one paper for another, or obtaining by some other trick or device an instrument which* the party did not intend to give. * * * The remedy is by a direct proceeding to avoid the instrument." The doctrine of this case was followed and approved in *Vandervelden v. Railroad*, 61 Fed. Rep. 54.

Mrs. Och knew that she was signing a release for any claim for damages that she then had against the defendant company, for the injuries then apparent. She testified that, owing to her injuries and dazed condition, she was unable to read or understand all of it; but she saw something in it about a release from all damages and told the agent she would not sign the release; that he then stated that he would fix it, and in her presence made an erasure on the paper giving her to understand that he was striking out the release clauses, leaving the paper simply a receipt for $20, which was to be in full if she experienced no further trouble from her injuries before she signed it.

The authorities which hold that the execution of a

contract obtained by fraud is void, although a valuable consideration may have been passed, are based upon the ground that the minds of the contracting parties never met, and that there is wanting that reciprocity of consideration essential to a valid agreement.

She is evidently a lady of unusual intelligence, as clearly shown by the objection which she first made to the release, and the precaution she took in obtaining the names and addresses of persons on the train at the time of the accident in order that she might procure their testimony in the event that she might need it thereafter. She signed her own name to the paper, and the burden rested upon her to show that its execution was obtained from her by fraud and deceit. There was nothing on the face of the release calculated to mislead or deceive. It plainly showed upon its face that it was not merely a receipt, and the presumption is that she had knowledge of its contents. Clearly, if there was no fraud practiced upon her, it was her own fault or negligence in failing to read it if she did not know its contents. *Snider v. Express Co.*, 63 Mo. 376; *Mateer v. Railroad*, 105 Mo. 320; *Wallace v. Railroad*, 25 N. W. Rep. 772; *Railroad v. Shay*, 82 Pa. St. 198; *Glenn v. Statler*, 42 Iowa, 107.

The release in question is not a mere receipt, but contains all the essentials of a valid contract, and, unless its execution was obtained by fraud or deception, is a bar to the present action, until set aside in a direct proceeding in equity for that purpose, in which event the money received in consideration therefor must be refunded or tendered back at the time of the institution of the procedings for its cancellation.

If, then, the contract of release was obtained by the fraudulent statements and representations of the physicians of defendant as to the extent of plaintiff's injuries, by which she was induced to execute it,

and accept the money in consideration therefor, then the contract was voidable at her will, but that it was absolutely void is a proposition to which we are unable to give our assent.

A void contract may be disregarded by either party; a voidable contract can not be. It will scarcely be contended that defendant company could have maintained an action against the plaintiff for the money paid on the contract of settlement under these circumstances. No executed contract, where a valuable consideration has passed, made between parties competent to contract, not immoral or prohibited by statute, nor against public policy, is void between the parties thereto, however fraudulently it may have been obtained.

And, if the release in this case is to be canceled, the parties should be put *in statu quo*. *Railroad v. Hayes*, 83 Ga. 558; *Ins. Co. v. Howard*, 111 Ind. 544; *Gould v. Bank*, 86 N. Y. 75; *McMichael v. Kilmer*, 76 N. Y. 36; *Ryan v. Ward*, 48 N. Y. 204; *Coon v. Knap*, 4 Seld. 402; *Cleary v. Electric Light Co.*, 19 N. Y. Supp. 951. In the case last cited it was said: "The rule undoubtedly is that, where a party seeks to rescind the contract on the ground of fraud or imposition, he must tender a return of what he has received under it before he can maintain an action at law; and, in an action in equity, he must at least tender a return by his bill of complaint."

As long ago as 1823, it was held by this court that a New Madrid certificate obtained through fraud or mistake, and without consideration, was not void but voidable, and good against the United States until annulled or set aside. *Stewart v. Rector*, 1 Mo. 361. This case was followed and approved in *Mitchell v. Parker*, 25 Mo. 31; see, also, *Kearney v. Vaughan*, 50 Mo. 284. The law as thus announced is, we think, applicable to the case at bar on this theory of the case.

If the money received by Mrs. Och was in consideration of a settlement for all injuries which might result to her in consequence of the accident, the retention of it after it became known to her that the release was obtained through fraudulent representation, and after she had decided to sue therefor, and to ignore said settlement, was as inconsistent with justice and fair dealing as was the conduct of defendant's agents in obtaining from her a release through fraud and deceit, if such was the case.

We are indebted to MACFARLANE, J., for views expressed in an unpublished opinion in the *Girard case*, *supra*, with respect to the subject now under consideration, in the following language:

"It is undoubtedly true, as a general rule, that one who, having been induced by fraud to enter into a contract, afterward exercises the right to rescind it, must restore the other party to the same condition he would have occupied had the contract never been made. Defendant claims that plaintiff's right to rescind the release in question falls within this rule, and we can see no sufficient reason why it should not. A distinction can not be fairly drawn between a release of liability for personal damages, or other tort, and that of a liability resting on contract."

It was held by this court in *Estes v. Reynolds*, 75 Mo. 565, that "a party can not affirm a contract in part, and repudiate it in part. He can not accept its benefits on the one hand, while he shirks its disadvantages on the other." The justice of this rule commends itself to every reasonable mind and every conscience, it matters not whether the fraudulent contract or transaction is brought in question by legal or equitable proceedings. The rule is declared by all the text-books and is followed as a general rule by all the courts.

The law will not permit plaintiff to retain the fruits of the settlement and at the same time ignore it as if obtained by fraud. It will not permit her to retain the money she received under the contract of settlement if in satisfaction of her entire claim and yet proceed in disaffirmance thereof. Kerr, Fr. and Mis., sec. 52; Chitty, Contracts, 1036; 1 Beach, Mod. Eq. Jur., sec. 76; Bigelow, Fraud, pp. 74, 75; *Thayer v. Turner*, 8 Metc. 550; *Evans v. Gale*, 17 N. H. 573; *Doane v. Lockwood*, 115 Ill. 490; 21 Am. & Eng. Encyclopedia of Law, 84; 2 Pomeroy, Eq. Jur., sec. 910; 2 Parsons, Cont. 679.

Until repudiation of the contract of settlement plaintiff had no cause of action. · Under such conditions, "something must then be done by the party defrauded before the contract can cease to be binding; * * so that it is specific performance reversed, the literal undoing * * * of the contract." 1 Bigelow, Fraud, p. 74; see, also, Chitty, Contracts [11 Am. Ed.], 1089, note 1, 1092; *Ackerman v. McShane*, 9 S. Rep. 483; *Kinne v. Webb*, 49 Fed. Rep. 512. "And if a party defrauded would exercise the right to rescind he must do so *promptly* on discovery of the fraud." SHERWOOD, J., in *Clough v. Holden*, 115 Mo. 359; see, also, *Masson v. Bovet*, 1 Denio, 69; *Selway v. Fogg*, 5 M. & W. 83, *Railroad v. Row*, 24 Wend. 74; *Hart v. Handlin*, 43 Mo. 171.

In *Jarrett v. Morton*, 44 Mo. 276, plaintiff and defendant had settled a disputed claim; defendant, although denying that he owed plaintiff anything, in order to avoid a controversy at the solicitation of plaintiff, "squared off" by giving him a note which he held on another party and upon which plaintiff was surety. Plaintiff put the note in his pocket without looking at it, but afterward found that it was for less than he supposed it was, yet he collected the amount due, and thereafter sued defendant on the original demand with-

out ever offering to return the note to him.   The court said:

"But the plaintiff finds the note less than he expected, and complains that he is deceived. And what does he do?   Does he at once, upon the discovery of the deception, look up the defendant and repudiate the settlement?   Not at all.   But he holds on to the price of the settlement, collects the note, pockets its proceeds, and still treats the claim as never having been adjusted. This the law will never permit.   If the plaintiff would repudiate the settlement, he must put the other party in the same condition he was before it was made.   He can not appropriate its benefits and deny its obligation. There never was but one doctrine upon this subject; and the books are full of decisions that if a party would rescind a contract for fraud or other cause, he must, as far as in his power, put the other party in the condition he would have been in had the contract not been made. Before commencing proceedings on his original claim, the plaintiff should have tendered back the note received of defendant—should have repudiated the set-tlement, and then he would have been at liberty to impeach it if set up against his claim.   But, as it is, he hangs on to it, and is not at liberty to deny its validity."

Settlements and releases apply alike to all kinds of claims, whether arising from contract or tort.   There can be no reason why it should not be so, and the authorities which hold to the contrary can not be sustained on reason or authority.

As there was evidence tending to show that the money received by plaintiff was in full satisfaction of her claim against the defendant, unless the *execution* of the release was obtained by fraud, she should have returned, or offered to return, the same before or at the time of bringing her suit, and incorporated in her petition a count in equity to set aside the settlement on

the ground of fraud as was done in *Blair v. Railroad*, 89 Mo. 383; *Allen v. Logan*, 96 Mo. 591; *Cleary v. Electric Light Co.*, *supra*, 19 N. Y. Supp. 951; *Francis v. Railroad*, 108 N. Y. 93.   Or the petition might have been amended, before or at the trial, upon proper terms, by adding a count in equity to set aside the settlement.   Until this was done she had no cause of action, for, until the settlement is set aside, if in fact there was one, it stands as an insurmountable barrier to the prosecution of this action.

Upon this branch of the case, while plaintiff, in her replication to defendant's answer, alleges that the release was obtained in part by the false and fraudulent representation of the physicians of defendant company, there was no evidence tending to show that she was in any manner misled thereby, and the judgment upon that question is *res adjudicata*.

As it logically follows from what has been said that the judgment must be reversed, only such questions will be adverted to as may necessarily arise on a retrial of the case, should it be remanded.

It is insisted that, by the compromise, Mrs. Och, according to her own evidence, released the defendant from at least a part of her cause of action, and that, as it was indivisible, it could not be split up into separate parts, and, in consequence thereof, she could not maintain this suit.   There can be no question as to this proposition as a general rule.   It was so held in *Moran v. Plankinton*, 64 Mo. 337; *Funk v. Funk*, 35 Mo. App. 246; *Green v. Von der Ahe*, 36 Mo. App. 394; *Mateer v. Railroad*, 105 Mo. 320; *Hinkle v. Railroad*, 31 Minn. 434.   And the rule "is as applicable to actions *ex delicto* as to those *ex contractu.*"   *Union, etc., Co. v. Traube*, 59 Mo. 355.   The *Mateer case* was an action for personal injuries and the ruling of the court on the ques-

tion now under consideration seems to have been predicated upon the fact that the plaintiff knew the full extent of his injuries at the time of the settlement, and therefore could not split up his cause of action, which "was one and entire."

But in this case, Mrs. Och, by express contract, as she claims, limited and confined her settlement and release to all injuries that were then perceptible, and eliminated therefrom any injuries that might subsequently follow as a necessary result of the accident. If her evidence is to be believed, she only settled for the injuries that were manifest at that time, and did not release her cause of action for subsequently accruing injuries and suffering, and her rights ought not to be prejudiced by reason of doing that which the defendant expressly contracted that she might do.

Actions for personal injuries have been maintained in cases where, at the time of the injury, personal property was also damaged by the same agent, and a compromise and release for the damages to the property was effected before suit was instituted for the personal injuries. *Bliss v. Railroad*, 160 Mass. 447; *Lusted v. Railroad*, 71 Wis. 391.

But we rest our conclusion on this question on the contract between the parties, if it was as claimed by Mrs. Och. In passing upon a similar question in *Blair v. Railroad*, 89 Mo. *loc. cit.* 393, SHERWOOD, J., in speaking for the court, said: "The doctrine is firmly rooted in equity that, when an instrument is so general in its terms as to release the rights of a party of which he was ignorant, and which were not in contemplation of the bargain at the time it was made, the instrument will be restrained to the purposes of the bargain, and the release confined to the right intended to be released."

Plaintiff's instructions are criticised because it is

insisted that they required a greater degree of care of defendant with respect to the window that caused the injury than is warranted by law, and that defendant was only required to make use of such care as was commensurate with the nature and use of the ventilator, and the possibility of dangerous consequences of its use.

While carriers of passengers are not insurers of their safety, and are not responsible when all reasonable care, skill and diligence, prudence and foresight have been employed, the law imposes upon them the utmost care and skill in selecting and furnishing safe means of transportation, and to that end to provide safe coaches and appliances, necessary for that purpose, including every part and parcel thereof, which very prudent men would exercise under like circumstances, and when the injury to the plaintiff was shown to have been occasioned by the falling upon her head of a ventilating window from the coach in which she was riding, then it devolved upon the defendant to show by a preponderance of the evidence that the injury was caused by something not under its control, and not from any fault, want of care, or watchfulness upon its part. The same degree of care was required of defendant as to all parts and all kinds of its property used in the transportation of its passengers, as compared with its liability to cause injury to them. The same rule applies when the injury is caused by the want of diligence or care by those employed by the carrier.

In *Meier v. Railroad*, 64 Pa. St. 225, it was said: "*Prima facie*, where a passenger, being carried on a train, is injured without fault of his own, there is a legal presumption of negligence, casting upon the carrier the *onus* of disproving it. * * * This is the rule when the injury is caused by a defect in the road, cars, machinery or by a want of diligence or care in

those employed, or by any other thing which the company can or ought to control as a part of its duty, to carry the passengers safely; but this rule of evidence is not conclusive."

The same rule was announced by this court in *Clark v. Railroad*, 127 Mo. 197. So in *Dougherty v. Railroad*, 81 Mo. 325, it was said: "That where the vehicle or conveyance is shown to be under the control, or management of the carrier or his servants, and the accident is such as, under an ordinary course of things, does not happen, if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care."

It would seem, from the authorities cited, that the criticism of the instructions, in placing the burden of proof upon defendant, is not justified by the authorities.

Nor do we think the court committed error in giving the fifth instruction asked by plaintiff, in modifying and giving the fourth instruction asked by defendant, or in refusing to give other instructions asked by it.

As there was no evidence tending to show want of sufficient mental capacity on the part of Mrs. Och to execute the release, that question should not have been submitted to the jury, and in this respect the third instruction given at her instance is erroneous. That instruction reads as follows: "3. If you find from the evidence that when the plaintiff, Mrs. Och, signed the release given in evidence by the defendant, she was not in a physical or mental condition to fully and fairly examine and understand the meaning and effect of that instrument, as a release of the damages demanded in this suit; or if you find that the claim agent of the defendant company represented to her

that he would erase the release clause in said paper, and that he then falsely pretended to make such change or erasure, but in fact did not make it; and you further find that the plaintiff Mrs. Och did not intend to release her claim for the damages herein sued for, but that she relied upon the said statement of the claim agent and his said pretended erasure, and that she was thereby induced to sign the paper without further examination, or that she was physically or mentally unable to fairly make such examination at the time; then, and in either of said events, the court charges you that such release is no bar to plaintiff's claim in this suit."

Plaintiff's sixth instruction is criticised in that it told the jury, that in assessing her damages, in the event their verdict should be for her, at such sum as would "compensate her for any and all pain and suffering by her induced and resulting from the injury complained of, including all bodily pain and mental anguish she may have suffered by reason of said injury, and, if she had suffered any permanent injury or incapacity resulting from said injury, they should also consider this, and by their verdict make reasonable compensation therefor," while, according to her own evidence, she admitted that defendant settled with and paid her for all damages for injury developed up to October 7, 1891, thus permitting her to recover for injuries for which she had already received satisfaction by way of a moneyed consideration, which she never returned or offered to return to defendant.

This instruction was manifestly erroneous, and prejudicial to defendant.

The judgment is reversed and the cause remanded. GANTT, MACFARLANE and ROBINSON, JJ., concur. SHERWOOD, J., concurs in reversing, but thinks plaintiff has no cause of action on the evidence. BRACE, C.

J. and BARCLAY, J., express their views in a separate opinion.

## SEPARATE OPINION.

BARCLAY, J.—We do not agree to all that is said and intimated in the opinion of our learned colleague, Judge BURGESS, and, therefore, state our views of the case.

The action is for damages to plaintiff, a married woman, on account of injuries sustained by her while a passenger on defendant's train. She charges negligence in that a transom in the upper part of a passenger car fell out (or was by the porter carelessly pulled out) of its place, so that it struck plaintiff and injured her.

The woman's husband is joined as a plaintiff. But as no claim for damages is asked on his account, we treat the case as though Mrs. Och were the sole plaintiff.

The answer denies the negligence, and sets up as a bar an accord and satisfaction, or release as it is termed, of which a copy will appear later.

The reply, in substance, states that the release was signed soon after plaintiff's injury; that she was then "sick in mind and body," unable to "carefully read and understand it," and that she was induced to put her name to it by fraudulent representations of defendant's agent that it was not a full release, etc. The pleading charges that the signature was fraudulently obtained, and the court is asked to declare the instrument null and void.

When the cause was called for trial, the following moves were made by counsel in the cause, as appears by the recital in the bill of exceptions, viz.:

"Defendant's counsel object to the trial of the cause by a jury on the ground that the pleadings present a question which should be tried by the court sit-

ting as a court of equity before the other branch of the case should be submitted to the jury.

"Plaintiff's counsel state that they do not ask for equitable relief from the court concerning the release, but rely on the facts set up, which should go to the jury.

"The court states that under the statements made by plaintiff's counsel, it will overrule the motion to have the question tried by the court which calls for the cancellation of the instrument.

"Defendant, by its counsel, at the time duly excepts."

The evidence tended to prove that while plaintiff was sitting in a chair, in defendant's car, she was hit by a transom which fell upon her while the porter of the car was attempting to move it with a stick, held in his hand. The transom struck plaintiff on the head, and she was rendered unconscious by the blow, until just as the train was approaching Sedalia, when she revived.

One of the important phases of the case is as to the proper legal force of her evidence in regard to the receipt. We append the material parts of her statement in the trial court on that subject, in her own language.

On plaintiff's direct examination.

"*Q.* Were you conscious of the window falling on your head? *A.* No, sir.

"*Q.* You became unconscious, you say? *A.* Yes, sir.

"*Q.* When did you regain your senses so as to be able to know anything that was going on? *A.* When I came to, there was a physician with me and all the ladies around me; I saw the blood and glass on the floor; my head was being bathed with water and wet towels.

"*Q.* What was the physician doing with you or your wounds? *A.* He seemed to be attending to the wounds, bathing it or picking the glass out, I do not remember.

"*Q.* Was there any blood on your face? *A.* Yes, sir; on my face and my clothes.

"*Q.* You saw the glass, did you? *A.* Yes, sir.

"*Q.* What was done, then, when the physician came? *A.* We were drawing into Sedalia; as soon as we got to Sedalia he took me out; we crossed a few tracks and took a carriage and went to the hospital.

"*Q.* What conveyance did he put you in? *A.* A carriage.

"*Q.* Did anybody accompany you and him? *A.* Nobody but my little boy.

"*Q.* Did you have any acquaintances there at the time? *A.* No, sir.

"*Q.* Where did he have you driven? *A.* To the Missouri, Kansas & Texas hospital.

"*Q.* When you got to the hospital, about what time in the morning was that, if you remember? *A.* I could not tell; it was right shortly after the accident, somewhere between seven and nine.

"*Q.* And how long did you remain there, if you remember? *A.* I do not know, but the impression was on me that we were to stop at Sedalia two hours. After leaving the hospital, I think I was there an hour, which makes me think I was there an hour.

"*Q.* When you left the hospital where did you go? *A.* Back to the depot.

"*Q.* How did you go? *A.* In a carriage.

"*Q.* Who put you in the carriage? *A.* The same doctor that took me there.

"*Q.* When you got to the hospital tell us what was done? *A.* I was ushered into a room where there were eight or ten physicians, if I remember correctly.

"*Q.* Do you know the name of the physician who accompanied you in the carriage? *A.* No, sir.

"*Q.* How did you know he was the physician of the company? *A.* From his actions I supposed he was a physician, and they termed him doctor.

"Mr. Jackson: It was Dr. McNeil, of the force.

"By Mr. Ellis: He accompanied you to the hospital? *A.* Yes, sir.

"*Q.* You went into a room where there were eight or ten doctors; what happened there? *A.* They examined it, bathed it and dressed it, applied some medicine, and dressed the wound on my lip; that was about all. They assured me that nothing more would come of it, that I was not seriously hurt, that it did not amount to anything.

"*Q.* Well, was there much conversation on your part there? *A.* No, sir.

"*Q.* How were you feeling, what was your condition at the time you got to the hospital? *A.* I was stunned. I didn't hardly know what was going on; I was in a stunned and dazed condition.

"*Q.* A stunned and dazed condition? *A.* Yes, sir.

"*Q.* Can you remember all that transpired there? *A.* I remember the doctors all consulting one with another and agreeing that I was not seriously hurt; that it did not amount to anything, that I would be all right in a day or two. They handed me a phial of medicine and told me to apply it. As well as I remember, it was something like arnica. Then I was taken into the breakfast room and breakfast served for myself and little boy. I was in no condition to eat anything; I think I sipped a little coffee. My little boy ate a hearty breakfast. I was taken back to the same room, and there the doctors surrounded me and as-

sured me.I was not seriously hurt and did not think I would ever hear from it again.

"*Q.* Did not think you would hear from it again? *A.* Yes, sir; I think the conductor came in and some man they called a claim agent.

"*Q.* Who was present at the time the claim agent was there, if anybody? *A.* The doctors brought him in and introduced him and then left again, as I remember now.

"*Q.* Do you remember the name of the claim agent? *A.* No, sir.

"*Q.* Do you remember the names of the doctors, or any of them? *A.* No, I do not know that I heard them.

"*Q.* Do you think you would be able to recognize them again? *A.* Perhaps.

"*Q.* When they introduced the claim agent to you, what happened then? *A.* He came forward and told me he wanted to pay me for the inconvenience I had been put to and little suffering, and asked me if I would accept $20, if I should need any medical attention on the way or after I came home. Then he handed me a receipt and said to me if I would sign this he would pay me $20. As I remember now, I tried to read it over and saw something in there about a release.

"*Q.* Release? *A.* Releasing the company always, for all time; I thought then I could hardly do it; that something might come up; I was stunned and dazed, yet I thought the blow on the head might produce other things; I did not fully realize what was going on and I told the claim agent I could not sign it under those circumstances.

"*Q.* Then what transpired? *A.* Then he took the papers and said he would fix that up to date.

"*Q.* Do what? *A.* Fix it so it would read only up to date.

"*Q.* What would be up to date? *A.* The payment up to date; I do not know that he used the words, but that is the way I understood.

"*Q.* If you do not remember the words, give the substance of it, as well as you remember. *A.* Twenty dollars was for payment up to date; if anything further should occur to notify them and they would be responsible.

"*Q.* Did he say that to you? *A.* Yes, sir.

"*Q.* Well, now, when he took the papers, saying this to you, what did he do? *A.* He had a pencil and made some erasure.

"*Q.* In what? *A.* On the paper.

"*Q.* Will you be good enough to look over the document on white paper and read it to yourself; I want you to examine it? (handing paper to witness). *A.* The paper does not read as I thought it did."

Further on she testified in regard to the release.

"*Q.* Then he paid you $20? *A.* Yes, sir.

"*Q.* Took the document and went out. *A.* Yes, sir.

"*Q.* I will ask you at the time what was your physical and mental condition? *A.* I was feeling very poorly.

"*Q.* Had you recovered from the blow on the head, the feeling from it? *A.* No, sir.

"*Q.* You have spoken about having felt stunned some time after the blow and while you were at the hospital; did you experience that feeling at the time this conversation was going on about this document? *A.* I was stunned and I didn't realize all.

"*Q.* You did not realize all what? *A.* All that was going on.

Och v. M., K. & T. R'y Co.

"*Q*. After you had signed the document, then what occurred? *A*. The doctors came in again and assured me I was all right, that I could go on my journey.

"*Q*. That was after you signed the release? *A*. Yes, sir."

On plaintiff's cross-examination:

"If I understand your previous statement, the claim agent stated he wanted to settle the matter with you and prepared a written paper of some kind, partly printed and partly written? *A*. I didn't understand him that way. I understood him to say he would give me $20 for the inconvenience I was put in, and for all other trouble to notify them, the paper I was to sign was a receipt for $20. I didn't think there was any more to it.

"*Q*. At that time he prepared this paper and handed it to you? *A*. Yes, sir.

"*Q*. And you read it over? *A*. Yes, sir.

"*Q*. And after doing so what did you do or say then? *A*. I saw the release then.

"*Q*. And did you object to that, do you say? *A*. Yes, sir.

"*Q*. Why did you object to it? *A*. Because I could not release them from all of it.

"*Q*. Now, read again, please, I didn't hear you before. I wish you would read the part you objected to. *A*. (Reading) 'I do hereby fully and forever release and discharge said company from any and all claims of whatever kind and character I may have on account of or arising from said accident or injuries in consideration of the sum of $20.'

"*Q*. That is the part you objected to? *A*. Yes, sir.

"*Q*. Did you tell him that was the part you objected to? *A*. Yes, sir.

"*Q.* Did you read over the clause to him? *A.* I didn't read it to him.

"*Q.* What did you say to him? *A.* I said I could not release forever and he said he would fix that; I would receive the $20 and to receipt that.

"*Q.* What were you to receive $20 for? *A.* For inconvenience and any doctors."

\*     \*     \*     \*     \*     \*     \*     \*     \*

"*Q.* You handed him that paper after you made your objection that you have stated? *A.* Yes, sir.

"*Q.* And he said he would fix that? *A.* Yes, sir.

"*Q.* How did he say he would fix that? *A.* He said it would read only up to date.

"*Q.* Up to date? *A.* Yes, sir.

"*Q.* How was he going to accomplish that, so it would read up to date? *A.* As much as I remember, he said he would erase that.

"*Q.* Did you see him erasing anything? *A.* Yes, sir, I saw him take a pencil and scratch it; I thought it was that.

"*Q.* You saw him commence to scratch it? *A.* Yes, sir.

"*Q.* What did he do after that? *A.* He handed it back to me; I think it was.

"*Q.* Anything with it—he handed you $20? *A.* I suppose so.

"*Q.* You remember that he handed you $20 with the paper. *A.* Yes, sir.

"*Q.* What did you do? *A.* I signed my name to the paper.

"*Q.* You laid it on the table before you, and you signed your name to it? *A.* Yes, sir.

"*Q.* Didn't you see the condition the paper was in then? *A.* I suppose had I not been stunned I

would have realized right away the condition it was in, but I relied on his word; I saw an erasure. I see one now.

"*Q.* That is the same one you saw then? *A.* I thought this part that I objected to was erased, as he told me he would do.

"*Q.* You had the paper right there with the opportunity to read it, whether you did or not, didn't you? *A.* I suppose the paper was there.

"*Q.* You have just stated it was there? *A.* Yes, sir.

"*Q.* And you had an opportunity to read it? *A.* Yes, sir.

"*Q.* And you signed your name under those circumstances? *A.* Yes, sir, relying on his word.

"*Q.* You accepted that $20? *A.* Yes, sir.

"*Q.* You still have it; you never returned it to the claim agent or company or anybody connected with it? *A.* No, sir."

On plaintiff's re-direct examination:

"*Q.* How did you happen to sign your name to that paper? *A.* I do not know whether the claim agent handed me that or not; I remember but little of that paper; I didn't know it was in existence.

"*Q.* You did none of the writing on it except the signature yourself? *A.* That is all."

The receipt as offered in evidence by defendant, reads as follows:

6-91 2M H S

FORM 813¾

## ACCOUNTS PAYABLE.

DISBURSEMENT VOUCHER.

Missouri, Kansas & Texas R'y Co. To ............ *Mrs. Wm. Och. ......Dr.

Address ............ St. Louis, Mo.

| 189 1 | | |
|---|---|---|
| Oct. 7. | In full settlement and satisfaction of all claims and demands against the Missouri, Kansas & Texas Railway Company for personal injuries received while ~~in the employ of the said Railway Co.~~ Passenger on train No. 2 on M., K. & T. Ry.—Caused by Ventilator Window falling— striking her on the head—cutting head and face— And I do hereby fully and forever release and discharge said Company from any and all claims of whatever kind and character I may have on account of or arising from said accident or injuries in consideration of the sum of Twenty Dollars | 20 | 00 |

I CERTIFY, That the above account has been examined, found correct, and audited,

Geo. J. Pollock,
General Auditor.

Approved for payment:

J. H. Hill,
For Prest. and Gen'l Manager.

RECEIVED ............ Sedalia, Oct. 7, ............ 189 1. OF MISSOURI, KANSAS & TEXAS RAILWAY COMPANY.

Twenty ............ DOLLARS,

in full for the above account. (SIGN HERE.) Mrs. Wm. Och.

20

$ ............ 100

(WITNESS HERE.)
J. D. Hollister.

Witness: ............

NOTE:—The above receipt must be *dated and signed* by the party in whose favor this Voucher is made or when signed by another party, the authority for so doing must in all cases accompany it.

Return Voucher to B. P. McDONALD, Assistant Treasurer, Sedalia, Mo.

* The part of the above in italics indicates the written portion in the original voucher.

We give the foregoing full extracts from the record in order that the important question of the probative effect of the plaintiff's testimony, in its bearing on the issue of fraud in procuring the release, may be clearly understood by the reader.

As a new trial is to be ordered, we think it due to the trial court to state what force should be ascribed to that testimony as proof of the issue raised by plaintiff's reply. We shall attempt to give our view on that point before we close this opinion.

We do not go into the details of the original cause of action. It need only be said that the evidence on that branch of the case tended to show negligence, warranting submission to the jury of the question of defendant's liability to plaintiff as a passenger on defendant's train, under the unanimous ruling of the court *in banc* in *Mellor v. Railroad* (1891), 105 Mo. 455, and earlier cases in this state.

The plaintiff's testimony further had a tendency to prove that, after she had signed the release, she returned to the depot, and continued on her journey by rail toward St. Louis. On the way, during the afternoon of the same day, she began to experience acute pains, and later suffered a miscarriage, followed by other consequences of a serious nature, which the medical evidence on her behalf ascribes to the shock of her original injury. At the time of the "settlement," neither she nor defendant's agents had any thought or expectation of such a result, so far as this record discloses.

The two legal issues of importance arise upon the release and upon the instructions on the measure of damages.

The jury found a verdict for plaintiff in the sum of $7,521.45, and judgment was rendered for that amount. Defendant appealed in due course.

1.    The paramount question is upon the receipt in the nature of a release.    It is not under seal.    Defendant claims that the issue of fraud, raised by the reply and plaintiff's testimony, can only be dealt with as an equitable one to be tried by the court, and not by a jury.    But the trial judge submitted that issue to the jury, and defendant assigns error on the ruling.

Plaintiff admits signing the paper and receiving the $20 mentioned.    But she does not admit agreeing to the terms of release which the paper contains.    On the contrary, her evidence tends to show that she declined to sign such a release, but that she consented to accept $20 in payment for her inconvenience and suffering "up to date," only.    She declares that the defendant's agent then said he would change the form accordingly, and that he made an erasure in it, ostensibly to conform to that understanding.    She then signed it, taking his word (as she says) that it expressed that agreement.    She was dazed and stunned from the effects of the blow on the head which had taken place within an hour before, and relied upon the agent's statement of the contents of the receipt.

Her evidence, already quoted, tends very clearly to prove that she did not agree to the release as it stands, though she signed the paper.

The inquiry then is whether, if the jury and court found her statement to be true (as the verdict and judgment show that they did), the release is any bar to her action for damages, not embraced within the agreement she actually made with the defendant's agent, and which she supposed (and had reason to suppose) the paper correctly recited.

In the case of *Girard v. Car Wheel Co.* (1894), 123 Mo. 358 (26 L. R. A. 514; 27 S. W. Rep. 648), it was held by a majority of the court *in banc,* that where

plaintiff signed an agreement, when his mental condition was such as to render him incompetent to make a contract, that fact, when proved, would avoid the effect of his apparent contract expressed by his signature.

Is there any difference in principle between obtaining a signature to such a paper from one who is mentally incapable of entering into an agreement (as in the *Girard case*), and obtaining a signature to such a paper from a woman, dazed and nervous from a recent shock, by representing the contents of the paper to be different from what they are? We say that there is no difference, so far as concerns the validity of such a document as a contract. An apparent assent thus obtained is worthless, where she believed (and had cause to believe) that she was signing an agreement of much narrower scope that had been verbally made with her.

We are in favor of adhering firmly to the majority ruling in the *Girard case* as founded on sound principle.

We are not satisfied to express ourselves in any vague or ambiguous terms in dealing with the subject of fraud in securing such releases.

It is one of the essential elements of a contract that the minds of the parties shall meet in respect of the subject-matter of the agreement.

Although, presumptively, the signature to a written agreement is evidence of assent to it, so as to shift the burden of proof on that point, yet it is very clear that where a signature has been obtained by false and fraudulent representations as to the terms of the paper, and that fact is proved to the satisfaction of the triers of fact, the party who has so obtained the signature can not (even in a court of law) take advantage of it as a bar to a just cause of action against him.

In the case in hand the plaintiff was willing to settle for $20 for the damages she had then sustained. She had been assured by the defendant's physicians that her injuries were trifling. That opinion was no doubt expressed in good faith. They did not know of plaintiff's pregnancy. But she, aware of her condition, refused to give a full discharge. The claim agent (according to her account) purported to put the paper in the form she desired.

If the paper went beyond her assent, and her signature was obtained to it on the false assumption (induced by the acts and words of the claim agent) that it contained the agreement she intended to sign, her signature to the false form was no assent at all, in contemplation of law or equity.

This is very ancient law, even in the English system.

A recent British work on the law of contracts declares that if the other party to a contract (which does not represent the true intent of one of the parties) has "caused the mistake by misrepresentation, designedly and for the purpose of inducing the contract, it is a fraud; and the contract may be avoided at law and in equity upon that ground." Leake, Contracts (1878), pp. 336, 351, 353.

A well known American writer on the same general subject thus states his conclusions on the point of this discussion:

"When a party has thus in form, impelled by fraud, put his name to something different from what he meant, he has not truly executed any contract. And his position toward the writing is not the same as though, under a purpose to sign it created by the like fraud, he had still subscribed to what he intended,—to be explained under our next sub-title. If the reader will consult some previous sections, he will see that on

nearly or exactly this question there are differences of judicial opinion. But, guided by the greater number of the cases now before the author, and, equally with them, by principles of the law whose effect can probably be intercepted only by special circumstances, we are conducted to the following. Such a contract is not merely voidable, it is void." Bishop, Contracts (1887), sec. 646.

Dr. Bigelow in his work on Fraud (1888), p. 53, declares:

"At common law it has often been held incompetent to a defendant sued at law on a specialty to plead that the instrument was obtained by false representations; it is a case, it is said, for equity alone. It is clearly otherwise of the *execution* of the instrument, as where the bond is misread to the obligor, or where his signature is obtained to an instrument which he did not intend to sign. In such cases fraud may be alleged at law."

A number of cases in England and in this country illustrate the propriety of applying the rules of law above stated to such facts as appear here. We shall quote from but one of them, merely citing the others.

In *Bliss v. Railroad* (1894), 160 Mass. 447, we find the following headnotes, descriptive of a very lucid judgment on the subject of releases in this class of actions, viz.:

"In an action against a railroad corporation for injuries occasioned to the person and clothing of the plaintiff, who gave to the corporation, shortly after the accident which caused the injuries, a receipt in full and a release, evidence that the oral agreement of settlement was for a small sum, and covered merely the injuries to the plaintiff's clothing, that the defendant's agent, who procured the plaintiff's signatures, represented to him that the receipt was only for the injuries to the

clothing, and that the release was merely a form, whereas they both covered his claim for personal injuries also, that the plaintiff, who at the time was in a dazed condition, signed both papers without reading them or knowing their contents, and that his personal injuries were in fact serious, will warrant a finding that the receipt and release were procured by fraud on the part of the defendant's agent.

"Where one who has sustained injuries to his clothing and also to his person by a railroad accident has been induced by fraud to execute to the railroad corporation a receipt in full and a release for both injuries, upon being paid a small sum, which was understood by him to be compensation merely for the injuries to his clothing, he need not return the money so received before bringing an action for the personal injuries."

See, also, on this point, *Lee v. Railroad* (1871), L. R. 6 Ch. App. 527; *Hirschfeld v. Railroad* (1876), 2 Q. B. D. 1; *Chicago, etc., R'y Co. v. Lewis* (1884), 109 Ill. 125; *O'Neil v. Iron Co.* (1886), 63 Mich. 690; *Ryan v. Gross* (1888), 68 Md. 381; *Sobieski v. Railroad* (1889), 41 Minn. 169; *Butler v. Railroad* (1892), 88 Ga. 594; *Cleary v. Electric Light Co.* (1892), 19 N. Y. Supp. 951, affirmed (1893), 139 N. Y. 643; *Sheanon v. Ins. Co.* (1892), 83 Wis. 507; *Smith v. Steamship Co.* (1893), 99 Cal. 462; *Shaw v. Webber* (1894), 79 Hun, 307.

Even in the federal courts, where law and equity are administered as distinct systems, it has been declared that:

"Fraud in the execution of the instrument has always been admitted in a court of law, as where it has been misread, or some other fraud or imposition has been practiced upon the party in procuring his signature and seal. The fraud in this aspect goes to the

question whether or not the instrument ever had any legal existence." *Hartshorn v. Day* (1856), 19 How. 223.

And in a very late case in the highest federal tribunal it has been held, in a unanimous opinion, that a release is not binding as a defense to an action at law, if obtained in circumstances amounting to a fraud on the signer, whereby he was led into giving formal assent to a paper different from his understanding as to the scope of the agreement which he intended actually to make thereby. *Union Pac. R'y Co. v. Harris* (1895), 158 U. S. 326 (15 Sup. Ct. Rep. 843).

The principle applied in the foregoing decisions has been recognized in Missouri in a case which holds that where full releases were obtained of a party, by inducing the belief on his part that they were mere receipts for money which the defendant owed plaintiff, he might retain the money and repudiate the release of other claims, fraudulently introduced into the paper, and differing from the actual agreement made, as found by the triers of fact. *Vautrain v. Railroad* (1880), 8 Mo. App. 538; affirmed (1883), 78 Mo. 44.

The idea on which the rulings above cited rest is that, as between the immediate parties, any fraudulent contrivance by which one is led to sign a paper under the belief that he is signing an agreement of a different and narrower purport, can not be allowed, in a court of law or equity, to bar the assertion of a just demand. Consent so obtained gives the form, but not the substance, of a contract. Hence, as between first parties at least, it may be disregarded by any court, in the absence of evidence giving the paper validity upon some other basis; as, for instance, subsequent ratification or acceptance.

In the case at bar, Mrs. Och, no doubt, agreed to settle whatever claim she had for damages sustained at

the time she signed the paper. She did not agree (but, on the contrary, declined to agree) to release damages that might result later from the injury. The gist of her whole evidence on this point is in this sentence:

"Twenty dollars was for payment up to date; if anything further should occur, to notify them, and they would be responsible." So viewed, the adjustment was reasonable, fair and just.

If, then, on making such an agreement, she was induced to sign a release in full, in the manner she has described, such release is not her contract to the extent of its terms, and it should form no bar to her recovery for damages, subsequently developed as the direct result of her injury.

2. Nor can the fact that plaintiff was careless in signing the paper (by accepting as true the representation of its contents made by word and act of the claim agent) preclude her from asserting the fraud, and obtaining the protection of a court of law against it. What she signed, the law takes to be her act until she shows that it is not her act. But when that showing is made, by proof of a fraud whereby her signature was secured to a contract different from what it was agreed the paper should express, her trust and confidence in the other party do not transform a trick into a thing of legal beauty.

Mere negligence of the defrauded does not make fraud truth, at law or in equity.

This is one of those rules of law that finds its source in the ordinary instincts of natural justice.

As has been said in an Illinois case:

"As between the original parties to the transaction, we consider there where it appears that one party has been guilty of an intentional and deliberate fraud, by which to his knowledge, the other party has been

misled, or influenced in his action, he can not escape the legal consequences of his fraudulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care." *Linington v. Strong* (1883), 107 Ill. 303.

Recently in New York it was said: "A mere device of the guilty party to a contract, intended to shield himself from the results of his own fraud, practiced upon the other party, can not well be elevated to the dignity and importance of an equitable estoppel." *Bridger v. Goldsmith* (1894), 143 N. Y. 428.

The rule we have briefly stated above (touching the bearing of negligence on positive fraud, as between the immediate parties) is well recognized in this state, as elsewhere. *Cottrill v. Krum* (1890), 100 Mo. 397; *Albany Sav. Inst. v. Burdick* (1881), 87 N. Y. 40; *Shrimpton v. Philbrick* (1893), 53 Minn. 366.

3. There is no evidence in the case of any fraud other than in the procurement of the writing relied upon as a release. Both plaintiff and the physicians of defendant supposed her injuries trivial at the time they so assured her.

Besides, the plaintiff's counsel at no time in the trial court made any attempt to prove that the settlement actually made for $20, "up to date," was not valid as so stated. Hence it is vain to discuss rules of law that might be applicable had such an attempt been made.

4. The fact that plaintiff settled for part of her original claim for damages, and reserved a right of action for other damages, should they be developed, is no obstacle to her recovery for the latter. The law to that effect is very old, and elemental.

In Chitty on Contracts [11 Am. Ed.] (1874), p. 1151, it is declared that "a release may be made to

extend to part only of a debt or claim." That propo-
sition was applied to facts resembling those of the case
at bar in the recent American case of *Bliss v. Railroad*
(1894), 160 Mass. 447, already quoted.

5. It may not be inopportune to remark that the
defendant, seeking to take benefit from the release
obtained of plaintiff by the claim agent, is also bound
by his statements and acts inducing her signature to
that document, in so far as they bear upon its validity.
*Barwick v. Bank* (1867), L. R. 2 Ex. 259; *Aultman v.
Olson* (1886), 34 Minn. 450.

6. But while we hold that plaintiff may defend
against the release as a full acquittance, because of the
fraud in procuring it of her in that form, we can not
discover, in her evidence, any substantial basis for the
finding that she "did not have sufficient mental capac-
ity to understand the nature and effect" of her act.
Yet the learned trial judge submitted that issue to the
jury as a ground of avoidance of the release.

Giving plaintiff's testimony a fair and reasonable
construction, we can not escape the conclusion that she
fully intended to make a settlement of her known dam-
ages, at the time she signed the paper. That she was
dazed, and, of course, not in a normal state of mind or
body, because of the recent shock, are evident facts.
Those facts have a potential bearing on the view to be
taken of her act in signing the receipt without reading
it, after she had been led to suppose that it had been
amended to conform to her wish.

But illness, of itself, is not necessarily equivalent
to contractual incompetency. It may or may not tend
to show such incompetency. That depends on the
circumstances.

This court in a late case unanimously held a woman
bound by a release she had executed, although at the
time she was sick and in bed in consequence of injuries

for which the release was given. *McFarland v. Railroad* (1894), 125 Mo. 253 (28 S. W. Rep. 590). While, on the other hand, in the *Girard case*, 123 Mo. 358 (25 L. R. A. 514; 27 S. W. Rep. 648), it was held that there was substantial testimony of mental incapacity to contract, at the time the release was signed.

The test, in each instance, is whether or not the evidence tends to show incapacity to enter into the contract. That test must be applied by the court, as a part of its general duty to determine the legal effect of the testimony adduced.

In this case the trial court, by plaintiff's third instruction, submitted to the jury two alternatives for a finding that plaintiff was not bound by the release, namely, first, that she was not, at the time, mentally capable of entering into the agreement; and, secondly, that her consent to the document (as it now reads) was obtained by fraudulent contrivance which prevented it from being regarded in law as her act.

In submitting the first of these alternatives, we think the learned trial judge was in error, upon plaintiff's own statement of the facts. She obviously understood and agreed to a release of her damages up to the time of the settlement. She must stand by that bargain, for aught that has been so far shown in this case. Her illness was not such as to relieve her from the responsibility of the agreement, knowingly made, with a full appreciation of its import.

The issue of mental incapacity to make a release should not have been presented to the jury. Indeed, it is quite doubtful whether, under plaintiff's reply, she ever made any claim of that sort in avoidance of the release.

For the error above indicated the judgment must go down, for it is settled law that instructions should be based on the actual evidence. It is generally bad

practice to authorize the jury to render a verdict upon a theory which there is no substantial proof before them to support.

7. Complaint is made by defendant of plaintiff's instruction on the measure of damages. It authorized compensation for "all bodily pain and mental anguish she may have suffered by reason of said injury." Yet, according to our interpretation of plaintiff's testimony, she had settled (and been paid for) all such pain and inconvenience, sustained before the release was signed.

The instruction should have limited the recovery to compensation for such direct and immediate results of her injury as first became known to her after the paper was signed. The allowance of "credit" for the $20 at the close of the instruction, did not remove the error mentioned.

But it is probable that the request by defendant for the sixteenth instruction (which the court gave on its behalf) should be regarded as curing this error, under our rulings to the effect that a party can not be allowed to complain on appeal of a mistake which his own course at the trial has invited. *Stevens v. Crane* (1893), 116 Mo. 408; *Quirk v. Elevator Co.* (1894), 126 Mo. 279; (28 S. W. Rep. 1080).

The sixteenth instruction is as follows:

"16. If you shall find from the evidence that under the instructions of the court the ventilator fell in consequence of defendant's negligence and Mrs. Och has not released the cause of action, then in assessing damages you should consider only such injuries and suffering of Mrs. Och, as you may find from the evidence were the actual and proximate result of the acts or omissions of defendant's agent, and in estimating damages you must exclude all effects resulting from other independent causes."

However, as there must be a new trial, it is not necessary to examine closely the instruction referred to.

Any just ground for criticism of it, or of any of the other instructions given at the former hearing, may be removed upon another trial.

8.   No question was raised in the circuit court as to any duty on plaintiff's part to refund the money paid to her by defendant.   She does not impeach the real settlement she says she made, and for which the money was received by her.   She only asserts that she was induced by fraud to sign a paper which carried her agreement further than the terms she actually accepted. *Kirchner v. Sewing Machine Co.* (1892), 135 N. Y. 182. We hold that the testimony tends to show such fraud, and that the trial court was right in submitting that issue to the jury; though in this ruling we do not comprehend a review of the details of the instructions at the former trial.

9.   We have so far treated the paper release as in effect a general one, since all the parties have so treated it throughout the litigation.   For that reason we do not go into the inquiry whether or not its terms should be differently construed, or restricted (at least in equity) so as to apply only to the damages developed at the time it was signed, and which were then within the intent and contemplation of the settling parties. (Compare *Lyall v. Edwards* (1861), 6 H. & N. 337; *Directors v. Blackmore* (1870), L. R. 4 H. L. 610; *Turner v. Turner* (1880), L. R. 14 Ch. Div. 829.)

We prefer to confine our rulings to the facts in judgment in the case at bar,. and hence refrain from any general discussion of other phases of the law of releases or of fraud.

We agree that the judgment should be reversed and the cause remanded.   Chief Justice BRACE joins in this opinion.