Indiana, Decatur and Western Ry. Co. v. Solomon Fowler.

103    565
Case 2
a201s 152

1. FRAUD—*In Obtaining Release of Claim for Personal Injuries.*— When a sum of money is received as payment for time lost on account of an injury, or for damages to property, and the receipt for this is fraudulently made, as a release to cover damages for all personal injuries, the money so received may be retained, and its retention is no bar to a suit for personal injuries.

2. SAME—*Cognizable in Court of Law.*—Fraud in the execution of an instrument has always been admitted in a court of law, as where the instrument has been misread, or some other fraud or imposition has been practiced upon the party in procuring his signature.

3. RELEASE—*Of Claim for Personal Injuries—Fraud.*— In settlements of claims for personal injuries fairness must be used, and any willful misrepresentation of facts by the party procuring a release constitutes fraud.

Trespass on the Case, for personal injuries. Appeal from the Circuit Court of Jasper County; the Hon. SAMUEL L. DWIGHT, Judge presiding. Heard in this court at the August term, 1902. Affirmed. Opinion filed September 11, 1902.

GEORGE W. FITHIAN, attorney for appellant; R. D. MAR-
SHALL, of counsel.

I. D. SHAMHART, attorney for appellee.

MR. JUSTICE WORTHINGTON delivered the opinion of the
court.

Appellee, having been injured in a wreck while a passen-
ger on appellant's train, caused by the breaking of a bridge,
brought suit and received a judgment of $1,000 for personal
injuries, from which judgment appellant appealed.

Nine days after receiving the injuries, and while appellee
was suffering on account of them, and was still in bed,
Graves, superintendent of appellant's road, Roberts, appel-
lant's attorney, and one Dr. Berns, called at appellee's house,
and upon the payment of $35 to appellee, procured from
him a release, in the following form:

"Accounts payable Indiana, Decatur & Western Rail-
way Co.

    "To Solomon Fowler, Dr..... ......$35.00

"On account of and in full compromise and settlement
of all damages, or claims therefor, on account of personal
injury to him whilst a passenger on one of the trains of the
Indiana, Decatur & Western Railway Company, near Ste.
Marie, July 16, 1900, when a train jumped the track and
went through a trestle, resulting in injury to him; this set-
tlement to be in full for all damages or claim or claims
therefor arising out of said accident and injury, in any way
or manner, to the said Solomon Fowler, and all claims for
damages, physician bills and all other claims whatsoever.
This to be in full release for any and all damages and all
such injuries, claims or damages.

    "Approved:    GEO. H. GRAVES,
                    "General Superintendent.

  "Correct:    R. D. MARSHALL,
            "General Solicitor.

"Received July 25, 1900, of the Indiana, Decatur &
Western Railway Company, thirty-five dollars, in full of
the above account.    $35.00.

                        His
              "SOLOMON  X  FAULLER.
                  mark.
          "P. C. BERNS, Witness."

The case turns upon the validity of the release.   If valid, appellee can not recover.   Counsel for appellant, at the trial, as shown by his abstract, said :

" We stand on our receipt in this case; that is our defense. * * * We rely on our settlement and receipt in full satisfaction of any claim he might have for any damages. The defendant admits everything in the declaration except as to the extent of his injuries.   Let him show—let him prove that."

As it was not urged in a motion for new trial, nor is it assigned for error that the damages are excessive, the amount of the judgment is not in question.   The release, appellee insists, was procured by fraud intentionally perpetrated by the agents of appellant.   Appellant denies this, and avers that it was knowingly and voluntarily signed by appellee, and that it is a bar to any recovery in this action.   The pleadings present this direct issue.   Appellant also insists, as a matter of law, that in any event appellee must have returned the $35 which he received when the release was signed before he could commence his suit.

That a release obtained by fraud, knowingly perpetrated, is absolutely void, is well established, both upon principle and authority.

If a release is voluntarily given, the party knowing that it is a release, although his signature may have been procured by false representations, the law is that the money received must be returned before suit is brought.   In such case it is a contract induced by false representation.   It is voidable, but not void.   But if the party executing the release was induced by fraud to sign it, not knowing that it was a full release of all claims, but believing it to be a receipt only for money paid for a specific purpose under circumstances that excused him from reading or ascertaining its contents, he is not bound to return the money received before bringing suit.   In such case it is not a contract of release of all claims, being absolutely void as such release on account of the fraud in its procurement.

In C., R. I. & P. Ry. Co. v. Lewis, 109 Ill. 129, in a case analogous to the case at bar, it is said :

" If the release was obtained from plaintiff by represen-
tations or acts of defendant's agents which induced in her
mind the belief it was only a receipt for money paid her at
the time, as compensation to her for loss of time and
expenses incident to the delay that had resulted from the
accident, and not as a discharge of defendant from any
claim she might have against the company for injuries sus-
tained, or if it was obtained by fraud and circumvention
on the part of the agents of defendant, the writing would
be void as to her.  *  *  *  If she was induced to sign it
under the belief created by defendant's agents that she was
simply signing a receipt for expenses, defendant would not
be permitted to plead it as a defense to the action.  That
would be to have an advantage from its own wrong, which
the law will not tolerate."  *  *  *

And again:

" On principle, an instrument absolutely void needs not
to be rescinded to remove it out of the way of the assertion
of a right.  It is for the obvious reason it never had any
binding force, and there was therefore nothing to rescind.
A contract void on account of fraud or for other reason, is
in law, as though it had never been executed."

To the same effect are Mullen v. Old Colony R. R., 127
Mass. 86; Beach on Modern Law of Contracts, sections
496–497.

In Hartshorn v. Day, 19 Howard, 211, it is said :

" Fraud in the execution of an instrument has always
been admitted in a court of law, as where it has been mis-
read, or some other fraud or imposition has been practiced
upon the party in procuring his signature."

Where one sustains personal injuries and at the same
time damages to his personal property, and a release for a
money consideration is given covering damages for both, if
it is shown that the release for injuries to the person was
fraudulently incorporated in the release, which was to be
for damages to property only, he may recover for damages
to his person without returning money received for dam-
ages to property.  Och v. M. K. & T. R. Co., 130 Mo. 27;
Bliss v. N. Y. C. & H. R. R. Co., 160 Mass. 447; Lusted v.
C. & N. W. R. R., 71 Wis. 391.

Gibson v. W., N. Y. & P. R. R. Co., 164 Pa. St. 142, and

Pawnee Coal Co. v. Royce, 184 Ill. 411, cited by appellant, both recognize the right to bring suit without returning the money received where a positive fraud has been practiced in securing the release. In the Gibson case, *supra*, it is said:

" When there is a disaffirmance of the contract because of fraud, the injured party may, in some cases, bring his action without repaying the money received on the fraudulent contract. In such case the money is retained, not as a part of the consideration of a contract he denies, but as a part indemnity for the fraud perpetrated upon him."

And in the Royce case, *supra*, it is said:

" If, however, a release is procured by the perpetration of an active or positive fraud upon the plaintiff by the defendant or its officers, there may be circumstances under which the plaintiff will not be required to return, or offer to return the consideration received for the pretended release, but he may bring his suit without doing so."

From an examination of these and other authorities we think it clear that when a sum of money is received as payment for time lost on account of an injury, or for damages to property, and the receipt for this is fraudulently made as a release to cover damages for all personal injuries, that the money so received may be retained, and its retention is no bar to a suit for personal injuries.

Was the release in the present case thus fraudulently obtained? This was a question of fact for the jurors to answer. In finding for appellee and in answering the special interrogatory asked by appellant, they have said that the release was procured by fraud and circumvention. If the evidence considered as a whole fairly tends to support such finding it should not be set aside.

In passing upon this issue, the circumstances of the case must be taken into consideration. At the time the release was obtained, nine days after the accident, appellee was in bed, confined there by his injuries and suffering " terrible " as he testifies, and unable to stand alone without assistance. He could neither read nor write, and had no one present as a friend or adviser except his wife, who could barely read.

The superintendent of appellant's road, its lawyer, and a doctor came to appellee's house, with the receipt and release already drawn, except as to the insertion of the amount. It is clear that the parties did not stand upon an equal footing to start with. A railroad superintendent, a skilled attorney, and a doctor pitted against a man who could neither read nor write, suffering in bed from his injuries, with no one to advise or inform him what was being done except his wife, of whom he testifies, "Well, sir, she couldn't read it at all; she can't read writing to do any good," describes a condition of affairs in which the parties contracting were not on equal terms.

Appellee testifies:

" I remember them, Roberts, Graves and Dr. Berns coming to see me. They said they come to see how I was getting along, and asked me what I thought I ought to have. He said he didn't come to set no price. They wasn't there to set no price.

Q. What, if anything, did he say he wanted to pay you for ? A. For loss of time.

Q. Occasioned by what ? A. By getting in that wreck.

Q. Do you remember what computation was made or how many days they were paying you for ? A. They said they would allow me $1.50 for twenty days.

Q. Go ahead and state how they finally sprung it to you. A. They said they would make me a present of $5. I don't know which one said it, or who suggested it; they were out in the kitchen.

Q. What, if any, paper did you sign that day ? A. I don't know what paper it was, or what paper they had. They came out and took the paper out of their pocket and said, 'Will you sign this paper ?' I don't know which one said it. I said I didn't care. I didn't sign it myself, he wrote my name. I can not read nor write. My wife can read and write a little bit, not enough writing to make out much.

Q. Have you heard this instrument read ? A. No, sir.

Q. Did you hear it read a while ago ? A. I heard Mr. Fuhean read it to the jury.

My wife can't read writing to do any good.

*    *    *    *    *    *    *

Q. What was said that day about paying you for any

personal injuries you received? A. There was nothing said that I heard about any injuries.

\* \* \* \* \* \* \*

I was lying in bed, sitting up in bed with my hands on the bed holding my weight off of my back on my arms, my feet hanging over the bed. I tried to stand up, Mr. Berns wanted me to try to stand up, and the hurt on my ankle and the bruises hurt me so that I couldn't stand to do any good. Mr. Berns helped me to stand. I was bobbling like I would fall and Berns, he catched me and I sat down again."

Cross-examination:

" Q. You say this instrument wasn't read over to you? A. It wasn't read to me.

Q. It wasn't explained to you, you say? A. No, sir.

Q. Did you sign it or authorize them to sign your name without knowing what it was? A. I told them I didn't care; they asked me two or three times about signing my name and I told them I didn't care.

Q. It didn't make any difference to you what the receipt was, did it? A. I don't know. I told them I didn't care if they signed my name.

Q. You didn't care what you signed—is that what you mean? A. I didn't know what I was signing, nor they didn't tell me what I was signing."

Re-direct:

" Q. What was your condition that day as regards pain and suffering? A. I was hurting terrible."

The testimony of appellant's witnesses, in some respects, tends to corroborate appellee's testimony in this, that the representations made by them were, that appellant was settling and paying appellee for loss of time only. They directly testify, over the objection and exception of plaintiff's attorney, that no fraud, deception, misrepresentation or circumvention was practiced in order to procure the execution of the " receipt."

Geo. W. Graves testifies, in substance, that he was superintendent of appellant's road. That he went in company with Roberts and Berns for the purpose of making a settlement with appellee for his injuries. That Roberts signed the signature of appellee to the receipt, appellee authorizing him to do so.

"Roberts told him we had come to make a settlement with him, and then the conversation was carried on between him and Roberts. Roberts asked him how long he had been idle, and what he was receiving for the work he had done. I think he also asked Dr. Berns about the probable time of appellee's sickness, or the probable time before he would be able to resume work. Roberts asked him the amount he was receiving a day. I think he said a dollar a day. So they computed the time, and I have forgotten just what it amounted to, but it was less than $30. Roberts asked if that was satisfactory and he said he thought he ought to have more, and remarked he ought to have $30, and finally in the windup of the thing, I said to Roberts to give him $35, and he said that was satisfactory. Roberts read the receipt over to him and explained what we came for."

"Q. State whether he explained the effect or purport of the receipt to Fowler?

Question objected to; objection overruled and exception taken by plaintiff.

A. Why, yes, sir, he explained what the receipt was for."

Cross-examination:

"Roberts told him who I was and explained what we came for, to make a settlement for his injuries. I couldn't tell all the conversation. It was during it that Berns was asked for his estimate of the time Fowler would be unable to work. I remember the rate per day as a dollar, and the amount as $26, something less than $30, but am not positive as to the amount. They compromised on $30. That was a little more than it figured. There was no suggestion that it be raised to $35. I simply told Roberts to make it $35. I think I said I wanted him to be perfectly satisfied, and in case there would be a few days more, why make it enough; so in order that he should have enough I told him to make it $35."

This answer, taken *verbatim* from the record, indicates that the witness, Graves, superintendent of appellant's road, at the time thought that he was settling for the number of days appellee had lost, and might lose on account of his injuries. If not, why did he say, make it $35, in order that it might be enough in case there were a few days over?

"Q. The only explanation that Roberts made of the release, I believe you said, was made when he came into the room and was explaining his business? A. Yes: he

said who we were when we went in, and I think Dr. Berns introduced us, telling who we were."

Dr. Berns, for appellant, testified in substance, that the company paid his bill for attending Fowler and that he paid for the conveyance to take Graves and Roberts out to see Fowler; that Roberts told appellee that they were there to pay him for his time and injuries; that Roberts asked him what he was getting a day, and was told a dollar a day; that he computed the time and that it amounted to about $25. So they asked him if he was satisfied, and he said he ought to have $30, or something to that effect, and Graves said to give him $35. They wrote the receipt for $35.

This evidence of Berns tends, we think, to show that the only amount then agreed upon was for loss of time.

It will be noticed that neither of these witnesses states definitely the number of days claimed by appellee. As it was only nine days after the injury the number must have been estimated. Appellee swears that twenty days was the number, and $1.50 per day the sum agreed upon. This would make even $30, and corresponds with the statement of Graves, that $5 was given over and in excess of the amount computed. Graves not having the money with him, Berns loaned it to him, and it was paid to Fowler's wife. Roberts wrote Fowler's name on the receipt at Fowler's direction.

This witness also testified, over the objection and exception of plaintiff, that there was no fraud or deceit, etc., practiced in obtaining the release.

The objection to questions calling for such answers should have been sustained. They called for conclusions of the witnesses upon a mixed question of fact and law. The examination should have been confined to what was said and done, and the jury left to draw conclusions under instructions from the court as to what constituted fraud.

The witness Berns was asked in cross-examination:

Q. You say the computation was made in figuring out his damages represented by Ex. A (the release); did they ask you for the probable length of time he would be incapacitated from work? A. Yes, sir; something.

Q. Was that computation based on your estimate ? A. I do not know what it was based upon.

Q. You say they figured out the amount at something less than $30 ? A. Yes, sir.

Q. By paying him at a certain rate per day ? A. Yes, sir.

Q. He expressed dissatisfaction with that amount and thought he ought to have more than $30 ? A. Nobody expressed dissatisfaction particularly. He was asked whether that would be sufficient, and after that he said he thought he ought to have more; they asked him what he thought he ought to have and he said he thought he ought to have $30.

Q. Who was it sprung it to $35 ? A. Mr. Graves.

Appellant's attorney, Roberts, testified, in substance:

" We told him (appellee) that we came to see if we could settle with him for the injuries he had received. We asked him what his business was, and what he made a day. He told me, I believe, $1 a day. He told me how long he had been in bed. I asked how much he wanted to settle. I figured with him as to the amount he could earn in that time and allowed him two weeks or ten days longer. I offered him $25 and he said he ought to have $30. Finally the superintendent said to give him $35, and he was satisfied. I told him I had prepared a receipt in full settlement and discharge of his injuries and would like to have him sign it, and took it out of my pocket, and read it to him and explained what it was for and that by it he released the company from all liability."

In cross-examination the witness stated that he did not remember whether at a former trial he had stated that the receipt was read to him or explained to him.

" I figured with him and paid him more than he could have earned, and paid him for his suffering. I don't remember the number of days, whether twenty or not. The receipt, except as to the amount, was prepared before we went there."

It will be observed that Berns does not testify that the release was read or explained to appellee. Appellee testifies that it was not read to him, nor was he told what it was. It will be observed also that both Graves and Roberts use the word " receipt " instead of release, when they say it was read to appellee.

The receipt taken by itself reads :

"Received July 25, 1900, of the Indiana, Decatur and Western Railway Company, thirty-five dollars, in full of the above account ($35).

his<br>
SOLOMON X FAULLER.<br>
mark.

F. C. BERNS, Witness."

The word "receipt" may have been used by these witnesses inadvertently instead of the word "release," or it may be from their testimony that the "receipt" alone was read, and the body of the paper not read.

Considering this evidence as a whole, and noting the positive testimony of appellant that "he said he wanted to pay me for loss of time, and that they would allow me for twenty days at $1.50 a day, making $30, and would make me a present of $5," and his positive testimony that the release was not read to him, nor was he told what it was, and considering the relative situation of the parties, it is not strange that the jurors concluded that the release was procured to be signed by the agents of appellant, by knowingly inducing appellee, who was unable to read or write, to believe that he was being paid only for loss of time, and was receipting for money so paid. If this was true the release was fraudulently obtained. Upon a careful review of the evidence we can not say that it was insufficient to warrant the jury in so finding.

It will be noted that this is not a case between appellee and a third party. It is a case directly between the parties to the transaction.

The cases of C., R. I. & P. R. R. v. Lewis, cited *supra*, Pioneer Cooperage Co. v. Romanowicz, 85 Ill. App. 407, Eagle Packet Co. v. DeFries, 94 Ill. 598, and I. C. R. R. Co. v. Welch, 52 Ill. 183, go far in asserting the doctrine that in settlements of this character, fairness must be used, and that any willful misrepresentation of facts by the party procuring a release constitutes fraud. In the latter case it is said in reference to a receipt for one month's wages, and containing the words "in full of all claims, demands and damages," etc., "forever releasing said company," etc. :

" If, however, the appellee was induced to sign it by representations that it covered merely his claim for a month's time, or a month's wages, or if he signed it under such a belief, induced by the words or acts of the appellant, then, of course, the release would not be a bar to the prosecution of this suit. This question should have been left to a jury."

The question in the case at bar was left to the jury and the court did not err in refusing the peremptory instruction asked by appellant.

We do not deem it necessary to discuss at length instructions 2, 3 and 5, criticised by appellant, nor the tenth instruction asked by him, which was refused.

It may be said in general in reference to them, that appellant, by his instructions, presented the issue of fraud to the jury as the controlling issue, and by his special interrogatory received a definite answer upon this issue.

The interrogatory was as follows :

" Was the receipt offered in evidence by the defendant obtained by the defendant from the plaintiff by fraud and circumvention? "

To this special interrogatory the jury answered " Yes."

This leaves no doubt as to the finding of the jury upon an issue material to the case and sufficient to support their verdict if the evidence was sufficient to support their finding.

Seeing no material error in the record the judgment is affirmed.