## ST. LOUIS AND THE KANSAS CITY

# COURTS OF APPEALS

AT THE

## MARCH TERM, 1906.

*(Continued from Volume 117.)*

ROGERS et al., Respondents, v. THE MERCANTILE ADJUSTER PUBLISHING COMPANY et al., Appellants.

**St. Louis Court of Appeals, March 27, 1906.**

1. **ACCORD AND SATISFACTION: Rescission: Statu Quo.** Defendant gave his notes for the purchase price of a monthly journal and afterwards claimed that he was induced to purchase the journal by fraudulent representations on the part of the plaintiff who sold it to him, and plaintiff-sued on some of the purchase money notes. Plaintiff and defendant then made a settlement of their differences in which the plaintiff reduced the indebtedness and the defendant executed new notes for the balance. Afterwards, in an action by the plaintiff on some of the notes last executed, the defendant could not defeat the action on the ground that the compromise settlement was induced by fraudulent representations of the plaintiff, without having offered to rescind the compromise settlement or to restore to plaintiff the portion of the original purchase price which had been released.

2. ———: ———: ———: **Consideration.** The provision of section 645, Revised Statutes of 1899, permitting a party when sued on a written instrument to prove failure of consideration, does not impair the rule that a party to the settlement of a disputed claim cannot escape liability on the settlement on the ground of fraud except by offering to rescind or tendering back what he received from the other party upon the settlement.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

AFFIRMED.

*Nathan Frank* for appellants.

The first instruction given for respondents, in that it authorized the jury to find for them on their pleadings in evidence without any consideration of the pleadings and evidence of appellants, was error; it purported to cover the whole case, but entirely left out of consideration appellants' defense. It particularly left out of consideration the defense of appellant, Mercantile Adjuster, which was not a party to the original sale to appellant, Ten Broek. Evans v. Railroad, 16 Mo. App. 522; Laughlin v. Gerardi, 67 Mo. App. 372. The error of such partial instruction cannot be cured by giving instructions for the other party supplying the omission, for the instructions must be consistent and harmonious. Goetz v. Railroad, 50 Mo. 472; Lesser v. Railroad, 85 Mo. App. 326; Holladay Tie Co. v. Moss Tie Co., 87 Mo. App. 167; Stevenson v. Hancock, 72 Mo. 612; Stone v. Hunt, 94 Mo. 475, 7 S. W. 431.

*Johnson, Houts, Marlatt & Hawes* for respondents.

Even if every fact be conceded which the defendants testified to, or offered to prove, concerning the alleged misrepresentation made at the time the notes sued on were given, yet such facts would not constitute a defense; and the plaintiffs would have been, and were, entitled to a peremptory instruction to the jury to find for them, because: (a) The statements imputed to Judge Terry were clearly but expressions of opinions, and at the most only "puffing" statements. 14 Am. and Eng. Ency. Law, p. 206. (b) Defendant Ten Broek had been in possession of the publication for over a year, and was in a better position to know its condition than Judge

Terry or the plaintiffs. Where false representations are made, and the means of knowledge are equally available to both parties, the law affords no relief to the party imposed upon, unless the other party, by deceit, prevents an investigation into the truthfulness of the representations. Lewis v. Land Co., 124 Mo. 687, 28 S. W. 324; Wade v. Ringo, 122 Mo. 322, 25 S. W. 901; Langden v. Green, 40 Mo. 363. (c) Defendants never attempted to rescind; but on the contrary affirmed the compromise agreement by paying upon the notes up to May 3, 1902, or two years and five months after they now claim to have discovered the falsity of the alleged "representations" of Judge Terry.

STATEMENT.—This action is on thirty-three promissory notes of $100 each, all dated October 25, 1899, executed by the Mercantile Adjuster Publishing Company, as maker, and indorsed by Gerrit H. Ten Broek, one of the appellants, who was the payee. The Mercantile Adjuster Publishing Company, which we shall designate as the Adjuster Company, is a corporation of which Ten Broek was president and a minority stockholder and had been for about fourteen years at the time the notes in suit were given. They were indorsed and transferred by Ten Broek to plaintiffs before maturity. The defense to the action is that the execution, indorsement and delivery of the notes were induced by fraudulent representations made by plaintiffs concerning the consideration for which they were given and that there has been a partial failure of the consideration. Plaintiffs Harper Rogers and Arthur H. Carleton in 1898 and prior thereto, were partners engaged in the furniture and carpet business at Sandy Hill in the State of New York. The firm had come into the ownership of a monthly journal published in the city of New York and known as "The Lawyer and Credit Man," a paper circulated principally among wholesale houses, bankers and attorneys at law, and dependent for support on their patronage. Rogers

and Carleton took over the paper from a debtor of theirs early in 1898, to secure payment of a demand against said debtor. They desired to dispose of it at once, as they were unfamiliar with the publishing business. The Adjuster Company, of which Ten Broek was president, published a monthly journal in St. Louis similar to The Lawyer and Credit Man. Ten Broek's attention was attracted to the latter publication and he began a negotiation looking to its purchase. The parties met in New York City in July, 1898, discussed the proposition and finally a sale of the journal was made to Ten Broek by the plaintiffs for $5,000, payable in monthly installments of $100. The sale occurred August 29, 1898, and included the journal itself and all plaintiffs' right, title and interest in it, its name, good-will, accounts and bills receivable. The bill of sale provided that Ten Broek should remit to plaintiffs $100 each month for fifty months. If he failed to pay one or more installments of the purchase price, plaintiffs were given the right, on ten days' notice, to declare the sale cancelled and void; and thereupon the property sold was to be redelivered to them and the notes previously paid by Ten Broek to be forfeited as liquidated damages. Ten Broek made two payments on the purchase price, leaving his indebtedness $4,800. In a letter dated October 15, 1898, he asked for an extension of time on the installment then due, and plaintiffs by a letter written November 22d, granted the extension and asked that he remit by December 1st the three installments which would be past due by that date. In his letter requesting the extension Ten Broek declared that The Lawyer and Credit Man had turned out to be the worst disappointment he had ever known and he seriously contemplated writing plaintiffs that he would abandon the whole enterprise. He said that of the $4,000 bills receivable, represented to him to be collectible, he had been able to collect only $200 and had been put to an outlay of $1,000 in running the paper. Instead of declaring an abandonment of the enterprise,

he requested indulgence in paying the matured install-
ments of the purchase price. That letter contained,
among other things, this statement: "The only reason
I made the contract with you was that I supposed I
could realize at least $4,000 out of the accounts. I now
know I will not get one-fourth of that sum out of them."
On November 28, 1898, Ten Broek wrote plaintiffs com-
plaining that he had been compelled to cancel 1,700 of
the contracts with the paper because the other parties
to the contracts were either dead or had repudiated their
obligations. On January 21, 1899, Ten Broek remitted
plaintiffs a check for $100 and said he thought that there-
after he would be able to make his payments regularly.
In this letter he said he wanted to realize for the plain-
tiffs what was due them as originally contemplated,
but if he had known the condition of affairs when the
contract was made he would not have entered into it
under any circumstances. Plaintiffs, in 1899, instituted
an action against Ten Broek in a New York court, he
having made only two payments, to recover ten install-
ments of the purchase price then past due. This action
drew from him a letter to Rogers, in which he said that
if the suit against him progressed his defense would be,
as indicated in his letter, that misrepresentations had
been made to him "as to the amount of live contracts
on the books of The Lawyer and Credit Man" at the
time it was turned over to him. He further stated that
he did not for a moment believe Rogers had been inten-
tionally guilty of misrepresentation, but the fact re-
mained that in the statement on which the paper was
purchased, contracts were represented to be in force with
parties who had been dead some time and with others
who repudiated their agreements. A man by the name
of Guimond had been conducting the paper for plaintiffs
prior to the sale to Ten Broek, and was retained after
the purchase of the paper to continue the management.
Guimond was familiar with the assets of the paper and
plaintiffs were not, and it was Guimond who made what-

ever representations were made to Ten Broek prior to
the latter's purchase of The Lawyer and Credit Man.
Now in the letter last mentioned Ten Broek, besides ac-
quitting Rogers of any willful misrepresentations, said
he did not believe Guimond had willfully misrepresented
the condition of affairs, but that any mistakes made in
stating the facts were probably due to the fact that the
books in the office of The Lawyer and Credit Man had
not been kept properly. In this letter Ten Broek said
that under these circumstances, in the answer he would
file to the petition in the suit plaintiffs had brought,
he would offer to return "The Lawyer and Credit Man"
and demand of them the return of all money he had
paid and damages for the money he had disbursed as
expenses in printing the paper. He further stated that
he had been consulting with the stockholders of the Ad-
juster Company about consolidating its paper, The Ad-
juster, with The Lawyer and Credit Man, and thought he
could make plaintiffs a proposition which would meet
with their approval. He asked that one of them come to
New York and discuss a settlement with him. The re-
sult of that letter was that Rogers and his attorney met
Ten Broek in New York about October 1, 1899, for the
purpose of settling the controversy then pending. Ten
Broek contended that he had only been able to collect
$700 out of about $3,300 or $4,000 of accounts, which
Guimond had represented to be good; that he expected
the accounts to reimburse him for most of the purchase
money and as the paper had been a failure he did not
want anything more to do with it. Considerable talk
occurred, the outcome of which was that, by reason of
Ten Broek's disappointment in collecting the bills receiv-
able due The Lawyer and Credit Man, plaintiffs agreed
to deduct $400 from the amount then owing, thus reduc-
ing Ten Broek's indebtedness to $4,400. The paper was
to be turned over to the Adjuster Company which should
execute forty-four notes of $100 each, payable to the
order of Ten Broek, who should indorse them to plain-

tiffs, and the action then pending against him should be dismissed by plaintiffs at their costs. Pursuant to this arrangement all the things agreed to be done were carried out. The Adjuster Company executed the thirty-three notes involved in this cause and eleven others, which were afterwards paid, payable to the order of Ten Broek, and he indorsed and delivered them to plaintiffs, who dismissed their action against him and paid the costs. In further execution of the agreement Ten Broek, on November 16, 1899, executed a bill of sale to the Adjuster Company, by which he sold and transferred to it the monthly publication known as The Lawyer and Credit Man, and all his right, title and interest in and to said publication, its name, good-will, accounts and bills receivable and everything pertaining to and connected with it, and that paper was consolidated with the journal called The Adjuster. The settlement occurred more than a year subsequent to the original sale of the paper to Ten Broek. After the settlement, the defendants, as stated, paid eleven of the notes given pursuant to it and made a partial payment on the twelfth note as late as May 3, 1902; that is to say, more than two years and a half after the settlement occurred. The following September, and nearly three years subsequent to the settlement, Ten Broek wrote this letter to plaintiffs:

"St . Louis, Mo., Sept. 11, 1902.

"George L. Terry, Esq.,

"93 Nassau St., New York, N. Y.

"Dear Sir: I regret that I have not as yet been able to take up the Rogers & Carleton notes. Just about the time the Adjuster income was getting to be in such shape as to permit my reducing these notes, the Post Office Department ruled the Mercantile Adjuster out of second-class mail matter, so that now the publication is being conducted at a loss and will be so conducted until we can get back second-class rates. Money matters are making satisfactory progress but have not yet come to a head. The fact that these notes are outstanding is giv-

ing me a good deal of worry, and I am very anxious to
have them retired at the very earliest possible date; and
you can assure Mr. Rogers that his failure to hear from
me is not due to any oversight or neglect, but to sheer
inability.   I am expecting to be called to New York al-
most any day, as my representatives there inform me
that the financial people are handling one of my deals
and are almost ready to report, and just as soon as they
do, you will hear from me.      Very truly yours,

                              "G. A. TEN BROEK."

Until this action was instituted, neither of the de-
fendants complained that fraud had occurred in procur-
ing the settlement.  In their amended answer to the peti-
tion in the present case, they alleged that in the negotia-
tion for the sale of The Lawyer and Credit Man to Ten
Broek, plaintiffs represented that there were 2,000 sub-
scriptions to the paper, and advertising contracts on
the books of account aggregating $4,195.93; that this
representation was made for the purpose of inducing
Ten Broek to purchase; that plaintiffs further represent-
ed that all the advertising contracts in existence and at
least 1,000 of the subscriptions, were good live con-
tracts; that the subscribers were using the publication
as a legal directory and were forwarding business to
attorneys advertising therein and that $3,666.88 of the
accounts were good and collectible; that Ten Broek re-
lied on said representations and believing them to be
true, purchased the paper and agreed to pay $5,000, pay-
able in installments of $100 monthly.   The answer then
proceeded to state that after Ten Broek took possession
of the paper he ascertained that many of the accounts
were worthless and uncollectible and threatened to
abandon the publication of the paper and return it to
plaintiffs, and surrender and cancel his contract.  A dis-
pute between Ten Broek and plaintiffs in consequence of
the alleged misrepresentations is alleged, and its settle-
ment in the manner we have related; without, however,

mentioning the New York litigation. It is averred that in the discussion of this settlement, the same representation originally made by plaintiffs regarding the number of live subscriptions to The Lawyer and Credit Man was repeated, namely; that there were at least 1000 live subscriptions. It is alleged that this representation was relied on by defendants, and that it and the false representations regarding the advertising contracts held by the paper, were the inducements to execute the notes in suit. The answer concludes as follows:

"Defendant further states that said seven hundred and ninety-four dollars and seventy-eight cents is all that he has realized out of said publication.

"Defendant further states that he paid two hundred dollars on the original contract price and afterwards paid eleven of said forty-four notes, making a total of thirteen hundred dollars which he has paid plaintiffs.

"Defendants further state that defendant Ten Broek incurred an expense in running and operating said publication in New York City and in his attempt to collect said accounts as aforesaid, in the sum of at least three thousand dollars.

"Defendants further state that for the reason aforesaid, there has been a partial failure of the consideration of said notes.

"Wherefore defendants pray judgment together with their costs."

In their replication plaintiffs denied the allegations of the answer, set out the facts of the original sale to Ten Broek, the action instituted against him in New York for delinquent installments of the purchase price, the compromise of that action on his statement that part of the bills receivable of The Lawyer and Credit Man had proved to be uncollectible, and the adjustment of the dispute by plaintiffs agreeing to accept $4,400 in payment of what Ten Broek owed them, pursuant to which agreement the notes in suit were given. During the progress of the trial the defendants saved exceptions

to the refusal of the court to permit them to amend their answer, the exclusion of certain testimony offered, and the rulings of the court on the instructions.

An appeal was taken from a judgment in favor of plaintiffs.

GOODE, J. (after stating the facts).—We consider that the judgment in this case is for the right party and that there is no defense to it on either the facts or the law. For proof of the supposed fraud in procuring the notes in suit, defendants relied on the testimony of Ten Broek that, in the negotiation for the compromise of the action instituted in New York for delinquent installments of the original purchase price of The Lawyer and Credit Man, plaintiffs represented that there were one thousand good live subscriptions to it; that he, Ten Broek, relied on this representation and laid it before the stockholders of the Adjuster Company, which was expected to take over the publication of The Lawyer and Credit Man, and in reliance on it, assented to a settlement. Ten Broek endeavored to convey the impression that plaintiffs sold the journal to the Adjuster Company and took its notes for the purchase price. But the facts testified to by him show this was not true and, indeed, could not have been true. The title to the paper was in him and had not been restored to plaintiffs. Nothing had been said or done toward retransferring the title to plaintiffs, except that he had threatened to offer to return it if plaintiffs continued to prosecute their action for what he owed them. To carry out the settlement Ten Broek sold the paper to the Adjuster Company and transferred the title by a bill of sale. In payment for it the company executed its notes to him for $4,400, and he indorsed the notes to plaintiffs; thus disposing of the then pending controversy in the mode insisted on by plaintiffs' attorney. Ten Broek initiated the negotiation for a settlement and in the letter in which he did so, stated that he had been conferring

with the stockholders of the Adjuster Company on a proposition to have the paper publishhed by it consolidated with The Lawyer and Credit Man, which consolidation would enable him to propose terms of compromise to plaintiffs which he thought they would approve. Ten Broek, after recognizing for months the validity of the original sale and his liability for the purchase money, had refused to pay, taking the position that misrepresentations about the live contracts on the books of The Lawyer and Credit Man had been made. The contracts referred to were for advertising in the paper. It is a misrepresentation regarding subscriptions, said to have been made in discussing the proposition for a compromise, that is chiefly relied on for a defense in this case. The contention that a fraudulent representation regarding the number of live subscriptions induced the settlement, is incompatible with the payments made long after it occurred and with the letter written nearly three years afterwards in which no claim of fraud was put forward. The reason then assigned for the default in paying the settlement notes was that the Post Office Department of the Federal Government had excluded the paper published by defendants from the postal rates charged for second-class mail matter, thereby causing the journal to be circulated at a loss instead of a profit. In that very letter Ten Broek said he was a great deal worried by the fact that the notes in suit were outstanding and was anxious to have them retired at the earliest possible date. So much for the facts, which, fairly considered, leave no doubt that there is no merit in the defense.

In turning to the law of the case, we find that the defendants are concluded by the fact that no offer was ever made to rescind the settlement for fraud or to restore to plaintiffs what had been relinquished by them to bring about the compromise. Plaintiffs had sued for past due installments of the original purchase money, and in consideration of the settlement, they dismissed

this suit at their own cost and waived $400 of Ten Brock's indebtedness.    He was president of the Adjuster Company and, therefore, the latter corporation had notice of the facts.    But this circumstance is immaterial; for the settlement was between plaintiffs and Ten Broek and the latter afterwards sold the property he had acquired from plaintiffs, to the Adjuster Company.    The undisputed facts show a complete accord and satisfaction between plaintiffs and Ten Broek and that, pursuant to the accord, the notes in suit and their companion notes which have been paid, were given to plaintiffs in satisfaction of the latter's claim against Ten Broek.    If defendants desired to escape the consequences of the compromise on the ground that a fraud had been perpetrated, it was incumbent on them to ask promptly for a rescission and offer to make the plaintiffs whole.    Nothing of the kind was done.    Not only was there no attempt to rescind, but there was no offer to restore to plaintiffs the portion of the purchase money which they had released, or otherwise to put them in the position they occupied previous to the compromise.    The answer in the present case in which the fraud was set up, contained no offer of that kind, but simply averred a partial failure of the consideration for the notes.    Now it is true that our Code provides that when a written contract for the payment of money is the foundation of an action, or defense, the proper party may prove failure of consideration in whole or in part.    [R. S. 1899, sec. 645.]    That enactment has been on our statute books since 1855, and perhaps longer.    [2 R. S. 1855, sec. 24, p. 1290.]    Nevertheless, it has not been regarded as impairing the rule that a party to the settlement of a disputed claim cannot escape liability on the accord and satisfaction, for fraud in inducing it, except by offering to rescind and tendering back what he received from the other party. This case is identical in all elements material to the present appeal, with Jarrett v. Morton, 44 Mo. 273. That action was one for the reasonable value of the

services of a slave belonging to Jarrett, but used by Morton for two years. One defense set up was that there had been an accord and satisfaction; and in support of the defense it was proved that Jarrett had frequently demanded payment for the services of the slave, but Morton had denied owing anything. Finally the matter was settled by the latter giving the former a certain promissory note on which Jarrett collected $50. Now in reply to the defense of accord and satisfaction, it was alleged that there was none, because of a false statement regarding the amount of the note, which had induced Jarrett to believe it was for $125 with interest for several years. The court instructed the jury that though Jarrett had received the note in settlement and collected $50, yet if the evidence showed he was induced to accept it by the deception and fraud of Morton, there was no compromise of the claim originally disputed and Jarrett was entitled to recover, though he had never returned the note. A counter instruction to that was asked by Morton and refused. It declared in effect, that though Jarrett had been misled as to the amount due on the note, yet, if after discovering the fraud, he collected the note for his own use, the jury would find for Morton. The giving of the instruction first mentioned and the refusal of the other were held by the Supreme Court to be clearly erroneous, and in commenting on the matter observations were made which are so pertinent to the persent appeal that we shall quote them:

"The delivery of the note to the plaintiff was not made in payment or part payment of an acknowledged debt, but in settlement of a disputed claim. The defendant never acknowledged that he owed anything—always denied it—but to avoid a controversy, at the solicitation of the plaintiff he 'squared off' by giving him the note. It was a compromise— a full settlement of the dispute. It extinguished the claim. But the plaintiff finds the note less than he expected and complains that he is deceived. And what does he do? Does he at once,

upon discovery of the deception, look up the defendant and repudiate the settlement? Not at all. But he holds on to the price of the settlement, collects the note, pockets its proceeds, and still treats the claim as never having been adjusted. This the law will never permit. If the plaintiff would repudiate the settlement, he must put the other party in the same condition he was before it was made. He cannot appropriate its benefits and deny its obligation. There never was but one doctrine upon this subject; and the books are full of decisions that if a party would rescind a contract for fraud or other cause, he must, as far as in his power, put the other party in the condition he would have been in had the contract not been made. Before commencing proceedings on his original claim, the plaintiff should have tendered back the note received of defendant—should have repudiated the settlement—and then he would have been at liberty to impeach it if set up against his claim. But, as it is, he hangs onto it, and is not at liberty to deny its validity."

That decision has been followed by the courts of appellate jurisdiction in this State whenever it was in point, and it is still the leading authority on the subject. [Estes v. Reynolds, 75 Mo. 563; Finlay v. Bryson, 84 Mo. 664, 669; Och v. Railroad, 130 Mo. 27, 47, 31 S. W. 962.] Other cases similar to the one at bar, in which notes given pursuant to a compromise, were enforced over a defense that the compromise was brought about by fraud, are French v. French, 84 Iowa 655, 659, and Hunter v. Lanious, 82 Texas 677.

It will be observed by reading the portion of the answer copied in the statement, that the defendants do not ask damages by way of counterclaim for the deceit alleged to have been practiced on them. Damages were neither alleged nor proved nor any instruction requested submitting a counterclaim for them. Neither did defendants ask for a rescission of the settlement. They sought to defeat plaintiff's action on the notes on the

ground that the consideration for them has failed in part. The consideration has not failed in whole or in part; for it consisted of the compromise of the litigation then pending between plaintiffs and Ten Broek. Defendants cannot hold the fruits of this compromise, make no effort to rescind it, but while leaving it intact, escape payment of the notes given pursuant to it.

The judgment is affirmed. All concur.